**FIRESIDE NISSAN, INC.,**
**Plaintiff–Appellant,**

**v.**

Daniel P. FANNING, Director, Department of Transportation For State of Rhode Island, et al., Defendants–Appellees.

No. 93–1977.

United States Court of Appeals,
First Circuit.

Heard March 9, 1994.
Decided July 20, 1994.

Ronald W. Del Sesto, with whom Peter P.D. Leach and Updike, Kelly, Spellacy & Del Sesto, Providence, RI, were on brief, for appellant.

John J. Igliozzi, Office of Legal Counsel, Rhode Island Dept. of Transp., Providence, RI, for appellee Dept. of Transp. for State of Rhode Island.

Gerald C. DeMaria, with whom Lawrence P. McCarthy III, Patrick B. Landers and Higgins, Cavanagh & Cooney, Providence, RI, were on brief, for appellee Nissan Motor Corp. in U.S.A.

John D. Biafore, with whom Goldman & Biafore, Providence, RI, was on brief, for appellee Nissan of Smithfield, Inc.

Before TORRUELLA and BOUDIN, Circuit Judges, and COFFIN, Senior Circuit Judge.

TORRUELLA, Circuit Judge.

Rhode Island's automobile dealership law allows existing dealers within a twenty-mile radius of a proposed new dealership to protest the establishment of the new dealership. The issue raised by this appeal concerns situations in which, by reason of a proposed new dealership in proximity to the state border, a part of that twenty-mile radius falls outside of Rhode Island. State officials have taken the position that within the twenty-mile area surrounding a proposed new dealership, only the dealers who are located inside Rhode Island's borders are covered by Rhode Island law and thus are entitled to protest the establishment of the new dealership. A Massachusetts car dealer who is located within the twenty-mile radius of a proposed dealership, but in Massachusetts, claims that this interpretation of Rhode Island law runs afoul of the Commerce Clause because it burdens and discriminates against interstate commerce. Because Rhode Island is merely applying its law to those subject to its jurisdiction and regulation, rather than extraterritorially, and because it neither burdens nor discriminates against interstate commerce in the process, we agree with Rhode Island and affirm.

## I. BACKGROUND

Plaintiff-appellant Fireside Nissan, Inc. ("Fireside"), a Massachusetts automobile dealer, brought this action against the Rhode Island Department of Transportation ("RI-DOT") after RIDOT excluded Fireside from participating in hearings regarding a proposed Nissan dealership in Rhode Island. Fireside claimed that RIDOT's application of Rhode Island's new dealership law to exclude Fireside merely because it was not located in Rhode Island was unconstitutional.

Rhode Island General Laws, Section 31–5.1–4.2 [1] sets out certain procedural requirements for establishing a new automobile dealership in the state. First, a manufacturer desiring an additional dealership must notify dealers "in the relevant market area" of its intentions. R.I.Gen.Laws § 31–5.1–4.2(a). "Relevant market area" is defined as "the area within a radius of twenty (20) miles around an existing dealer or the area of responsibility defined in the franchise, which-

---

1. R.I.Gen.Laws § 31–5.1–4.2 provides in relevant part:

(a) In the event that a manufacturer seeks to enter into a franchise establishing an additional new motor vehicle dealership ... within or into a relevant market area where the same line make is then represented, ... the manufacturer shall in writing by certified mail first notify the department ... and each new motor vehicle dealer in such line make in the relevant market area.... [A]ny such new motor vehi-

cle dealership may file with the department a protest to the establishing or relocating of the new motor vehicle dealership.... When such a protest is filed, ... the manufacturer shall not establish or relocate the proposed new motor vehicle dealership ... until the department has held a hearing, nor thereafter, until the department has determined [whether] there is good cause for not permitting such new motor vehicle dealership.

ever is greater." R.I.Gen.Laws § 31–5.1–1(J). Existing retail dealers in the "relevant market area" may then protest the establishment of the new dealership in which case RIDOT must hold a hearing to determine if "there is good cause for not permitting" the additional franchise. R.I.Gen.Laws § 31–5.1–4.2(a). The statute does not explicitly state whether or not the dealers who may protest the establishment of a dealership in the "relevant market area" must be located in Rhode Island or be a licensed Rhode Island dealership.[2]

In March of 1991, Nissan Motor Corporation in U.S.A. ("Nissan USA"), gave notice to RIDOT, Fireside, and other Nissan dealers of its intention to establish a dealership in Smithfield, Rhode Island. Fireside, which sells and services Nissan automobiles, is located in North Attleboro, Massachusetts, approximately two miles from the Rhode Island border and within twenty miles of Smithfield. Fireside is therefore squarely within the "relevant market area" of the Smithfield dealership. Fireside is not a licensed automobile dealer in Rhode Island but instead holds a Massachusetts dealership license.

In response to Nissan USA's notice, Fireside filed a protest with RIDOT on April 12, 1991. Three Rhode Island dealers of Nissan automobiles, who were also within the "relevant market area," filed protests with RIDOT as well. On February 13, 1992, RIDOT issued a notice to Fireside and the other dealers stating that it was scheduling a hearing regarding the Smithfield dealership on April 2, 1992.

At the hearing, Nissan USA moved to exclude Fireside because it was an out-of-state dealer. RIDOT, acting through the Rhode Island Dealer's License and Regulations Office, determined that Fireside lacked standing to participate in the hearing and excluded Fireside from presenting witnesses or evidence at the hearing. The three Rhode Island dealers did participate at the hearing and presented evidence on their own behalf.

Fireside was prepared to present evidence at the hearing showing that 48% of Fireside's sales and 45% of its service business went to Rhode Island residents. In addition, Fireside would have established that 100% of its cable television advertising and 75% of its print advertising is done in Rhode Island.

After the hearing, RIDOT determined that good cause existed for the establishment of the Smithfield dealership. According to R.I.Gen.Laws § 31–5.1–4.2(b), RIDOT must base its determination of "good cause" on the "existing circumstances, including, but not limited to:"

(1) Permanency of the investment of the existing new motor vehicle dealer(s) in the community;

(2) Whether the new motor vehicle dealers of the same line make in that relevant market area are providing adequate consumer care ... which shall include the adequacy of motor vehicle sales and service facilities, equipment, supply of motor vehicle parts, and qualified service personnel;

(3) Whether there is reasonable evidence that after the granting of the new motor vehicle dealership, that [sic] the market would support all of the dealerships of that line make in the relevant market area;

(4) Consequently, whether it is injurious to the public welfare for an additional new motor vehicle dealership to be established.

[A]ny person engaged in the business of selling, offering to sell, soliciting or advertising the sale of new motor vehicles and who holds, or held at the time a cause of action under this chapter accrued, a valid sales and service agreement, franchise or contract, granted by the manufacturer or distributor for the retail sale of said manufacturer's or distributor's new motor vehicles.

R.I.Gen.Laws § 31–5.1–1(C).

---

2. Throughout Title 31 of the Motor Vehicle Code, the term "dealer" is defined as:

Every person engaged in the business of buying, selling, or exchanging vehicles of a type required to be registered hereunder and who has an established place of business for such purpose *in this state.*

R.I.Gen.Laws § 31–1–19 (emphasis added). For purposes of the provision regarding the establishment of new car dealerships, R.I.Gen. Laws § 31–5.1–4.2, however, the right to protest at a hearing applies to any "new motor vehicle dealer" which is defined as:

R.I.Gen.Laws § 31–5.1–4.2(b).

Upon consideration of these factors, RIDOT found cause to issue a license to the Smithfield dealership, which is now known as Nissan of Smithfield, Inc. ("Smithfield Nissan").

Fireside commenced this action on April 9, 1992, naming Daniel Fanning, Director of RIDOT as the defendant. Fireside sought a declaration that RIDOT's interpretation of Section 31–5.1–4.2 as excluding Fireside from the new dealership hearing violated the Commerce Clause, the Privileges and Immunities Clause, the Due Process Clause and the Equal Protection Clause of the United States Constitution. Fireside also sought an injunction restraining RIDOT from precluding Fireside from participating in future hearings as well as a temporary restraining order and a preliminary injunction enjoining RIDOT from granting a dealership license to Smithfield Nissan. Nissan USA and Smithfield Nissan intervened in the action.

The district court denied Fireside's requested relief. The court found that the exclusion of Fireside from the dealership hearings did not violate the Commerce Clause or otherwise violate Fireside's constitutional rights. As a result, Fireside could not show the irreparable harm or the likelihood of success on the merits necessary for the granting of a preliminary injunction. The court also denied Fireside's request for a declaratory judgment and a permanent injunction and entered a final judgment in favor of RIDOT, Nissan USA, and Smithfield Nissan, 828 F.Supp. 989.

## II. ANALYSIS

Fireside's right to its requested relief, including the preliminary and permanent injunctions and the declaratory judgment, depends primarily on whether the exclusion of Fireside from RIDOT's new dealership hearings violates the Constitution. Before the court will grant a preliminary injunction, Fireside must establish, among other things, that it faces a likelihood of success on the merits and that it will suffer irreparable harm if the injunction is not issued. *Planned Parenthood League v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981). Fireside alleges that it will suffer irreparable injury from RIDOT's violation of Fireside's constitutional rights. *See National People's Action v. Village of Wilmette,* 914 F.2d 1008, 1013 (7th Cir.1990), *cert. denied,* 499 U.S. 921, 111 S.Ct. 1311, 113 L.Ed.2d 245 (1991) (finding constitutional violation sufficient to establish irreparable injury); *Mitchell v. Cuomo,* 748 F.2d 804, 806 (2d Cir.1984) (same). Likewise, the merits of the permanent injunction and the declaratory judgment also turn on the constitutionality of RIDOT's actions. Because we uphold the district court's finding that RIDOT did not violate the Commerce Clause or any of Fireside's constitutional rights, we affirm the final judgment in favor of the defendants.

As a preliminary matter, we find it beneficial to our constitutional inquiry to clarify the nature and purpose of the Rhode Island new dealership statute, R.I.Gen.Laws § 31–5.1–4.2. Title 31 of Rhode Island General Laws governs state regulation of motor and other vehicles. Chapter 5.1 of that title regulates business practices among motor vehicle manufacturers, dealers and distributors. The provision covering the establishment of new automobile dealerships, R.I.Gen.Laws § 31–5.1–4.2, is designed to protect existing dealers and consumers from the detrimental effects of aggressive franchising practices by the automobile manufacturers whose efforts to establish excessive competing franchises are considered to be potentially "injurious to the public welfare" if not properly regulated. R.I.Gen.Laws § 31–5.1–4.2(b).

The district court found that the statute targeted only activities which occur within the state of Rhode Island performed by businesses seeking or holding Rhode Island dealership licenses. According to the court, R.I.Gen.Laws § 31–5.1–4.2 was designed to safeguard the interests of those dealers and consumers located in Rhode Island; the Rhode Island legislature did not intend for the statute to apply to, or for the benefit of, out-of-state dealers such as Fireside. As a result, the court concluded that RIDOT properly applied the statute by excluding Fireside from the new dealership hearings.

We agree with the district court's finding on this issue. Taking its cue from the Sixth

Circuit, which interpreted a similar Kentucky statute as excluding out-of-state dealers from new dealership hearings, *BMW Stores, Inc. v. Peugeot Motors of Am., Inc.*, 860 F.2d 212 (6th Cir.1988), the district court based its analysis on the stated purposes and language of the statute, the interpretation of the statute by state regulators and on general principles of statutory construction. Because we find the first two factors to be the relevant considerations, we discuss them below.

Although R.I.Gen.Laws § 31–5.1–4.2 does not explicitly include or exclude out-of-state dealers, the declared policy of the statute indicates a concern for protecting only Rhode Island dealers and residents. As in *BMW Stores*, the new dealership licensing provision is aimed at protecting "the investment of the existing new motor vehicle dealer[s] in the community" and safeguarding the "public welfare." R.I.Gen.Laws § 31–5.1–4.2(b). *BMW Stores*, 860 F.2d at 215 (noting that the declared policy of the Kentucky statute was to "preserve the investments and properties of the citizens of this state").[3] The new dealership provision is one part of a set of provisions concerning the duties, obligations, liabilities and privileges of licensed dealers in Rhode Island and their supplying manufacturers. R.I.Gen.Laws. §§ 31–5.1–1 through 31–5.1–20. None of these duties and obligations apply to Fireside because it is not licensed in Rhode Island. Accordingly, the privileges that correspond to such duties and obligations do not apply to Fireside either. The new dealership provision, with its procedure for hearings, is simply part and parcel of Rhode Island's regulation and licensing of local dealerships. It makes no sense, therefore, to apply Rhode Island's comprehensive regulatory scheme for the benefit of out-of-state dealers.

■ Furthermore, as in *BMW Stores*, state regulatory officials have interpreted the

state's new dealership statute as applying only to in-state dealers, an interpretation that deserves some measure of deference. *BMW Stores*, 860 F.2d at 215; *Gallison v. Bristol School Comm.*, 493 A.2d 164, 166 (R.I.1985). We disagree with Fireside's claim that RIDOT has not conclusively determined whether R.I.Gen.Laws § 31–5.1–4.2 applies to out-of-state dealers. Fireside points to the fact that, prior to the hearing for Smithfield Nissan, RIDOT promulgated proposed rules and regulations that included a provision, Section XI, that explicitly excluded out-of-state dealers from protesting new dealerships and participating in hearings. The final rules and regulations, however, were issued without adopting Section XI. Fireside argues that the failure to adopt Section XI indicates an intent to include out-of-state dealers in the hearings. We disagree.

First of all, the proposed Section XI, while precluding out-of-state dealers from cross-examining witnesses or presenting evidence, did allow for out-of-state dealers to offer verbal or written statements at the hearings at RIDOT's discretion. The proposal thus could be interpreted as granting more participation rights to out-of-state dealers than they would otherwise enjoy. As a result, we do not know if the proposal was rejected because it was too permissive or because it was too restrictive, i.e., because it removed out-of-state participation rights that RIDOT thought out-of-state dealers should have or because it granted new rights that RIDOT thought out-of-state dealers should not have. RIDOT's failure to promulgate Section XI is thus inconclusive. Secondly, RIDOT's current regulations for R.I. 31–5.1 state that their purpose is:

(a) ... to protect the interests of the public when dealing with motor vehicle dealers *in Rhode Island*. . . .

---

**3.** We do not attach any significance, as does Fireside, to the use of the word "community" in Rhode Island's statute instead of the words "citizens of this state" in the Kentucky statute. Both terms evidence the legislature's concern with the welfare of the public which it is charged with protecting. Also, Fireside incorrectly claims that the Kentucky statute differs from the Rhode Island statute because Kentucky's does not state as

a purpose the safeguarding of the general public interest. The Kentucky statute explicitly states that its purpose is the promotion of "the public interest and public welfare" and mentions as one of its concerns the provision of "convenient consumer care," which clearly indicates the same concern for consumers and the public as the Rhode Island statute. Ky.Rev.Stat.Ann. §§ 190.-015; 190.047(7)(b).

(b) ... to implement the provisions of Sections 31–5 and 31–5.1 regarding the issuance, suspension and/or revocation of such licenses as well as the regulation of business practices *among the businesses seeking or holding those licenses.* (emphasis added)

This demonstrates RIDOT's intent to apply R.I.Gen.Laws § 31–5.1–4.2 only to Rhode Island dealerships. In any event, the only evidence we have of RIDOT actually taking a stand on the specific issue before us is RIDOT's actions in this case. RIDOT excluded Fireside from the hearings and thereby affirmatively expressed its interpretation of R.I.Gen.Laws § 31–5.1–4.2 as barring participation of out-of-state dealers in new dealership hearings.

Fireside maintains that certain language in the statute expresses an intent to include Fireside in the new dealership hearings. Fireside notes that it falls within the literal definition of a "new motor vehicle dealer" inside the "relevant market area" for purposes of R.I.Gen.Laws § 31–5.1–4.2, because the definition of "new motor vehicle dealer" includes "any person" selling cars, R.I.Gen. Laws § 31–5.1–1(C), and the "relevant market area" is the area within a twenty mile radius around an existing dealer, R.I.Gen. Laws § 31–5.1–1(J). The lack of an explicit statement that the "relevant market area" stops at the state border does not, however, indicate that the state affirmatively intended to include out-of-state dealers in licensing hearings. On the contrary, the definition of "dealer" for all of Title 31 of Rhode Island's General Laws is limited to persons who have an established place of business "in this state." R.I.Gen.Laws § 31–1–19(a). Fireside is correct that the definition of "new motor vehicle dealer" as used in the licensing section at issue here, R.I.Gen.Laws § 31–5.1–4.2, does not contain this limitation. R.I.Gen. Laws § 31–5.1–1(C). However, the term "relevant market area," the other key term in R.I.Gen.Laws § 31–5.1–4.2, is defined as a twenty mile radius "around an existing *dealer,*" employing the general term "dealer" from 31–1–19(a) and not "new motor vehicle dealer" from § 31–5.1–1(C). One could thus interpret R.I.Gen.Laws § 31–5.1–4.2 as granting protest rights only to Rhode Island

dealerships because only Rhode Island dealers can be in a "relevant market area."

■ Fireside also points to R.I.Gen.Laws § 31–5.1–2 for evidence that the licensing provision applies to out-of-state dealers. R.I.Gen.Laws § 31–5.1–2 states:

Any person who engages directly or indirectly in purposeful contacts within this state in connection with the offering or advertising for sale or has business dealings with respect to a motor vehicle within the state shall be subject to the provisions of this chapter and shall be subject to the jurisdiction of the courts of this state, upon service of process in accordance with the provisions of the general laws.

This provision is not a general grant of extraterritoriality but rather an affirmation that parties who are covered by the various substantive provisions in Chapter 5.1 of Title 31, which regulates manufacturers, dealers and distributors, cannot escape enforcement of those provisions by claiming they are nonresidents. If Fireside's interpretation were adopted, the substantive regulatory provisions in Chapter 5.1—for example, those regarding fraud and breach of warranty—would apply to Fireside and any other dealer in any other state, an absurd result. Notwithstanding R.I.Gen.Laws § 31–5.1–2, one must still look to the specific substantive provisions of Chapter 5.1 to see who is covered. Doing so reveals that § 31–5.2 was mainly directed toward out-of-state automobile *manufacturers,* rather than dealers. A majority of the provisions in chapter 5.1 impose explicit duties and obligations on manufacturers, all or most of whom, presumably, are, like Nissan USA, from outside of the state. *E.g.,* R.I.Gen.Laws §§ 31–5.1–4 through 31–5.1–11. Unlike the definition of "new motor vehicle dealer" which includes generally "any person" selling cars, R.I.Gen. Laws § 31–5.1–1(C), the definition of "manufacturer" specifically includes any person, "resident or nonresident," who makes cars. R.I.Gen.Laws § 31–5.1–1(B). Thus, the Rhode Island legislature has clearly expressed an intent to regulate out-of-state manufacturers when they do business in Rhode Island. No such expression exists

with regard to out-of-state dealers selling cars in another state. The absence of any specification that "new motor vehicle dealers" can include "nonresidents" confirms RIDOT's interpretation of R.I.Gen.Laws § 31–5.1–4.2 as excluding Fireside from the new dealership hearings.

Now that we have determined that Rhode Island's new dealership law applies only to in-state dealers, we can proceed to the task of determining whether RIDOT's action of excluding Fireside from the new dealership hearings was a constitutional exercise of state power.

## A. *Commerce Clause*

■ The Commerce Clause, while literally a grant of power to Congress, also restricts states from passing laws that interfere with interstate commerce. *Wyoming v. Oklahoma*, — U.S. —, —, 112 S.Ct. 789, 800, 117 L.Ed.2d 1 (1992); *New Energy Co. v. Limbach*, 486 U.S. 269, 273, 108 S.Ct. 1803, 1807, 100 L.Ed.2d 302 (1988). "This 'negative' aspect of the Commerce Clause prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *New Energy*, 486 U.S. at 273–74, 108 S.Ct. at 1807–08; *see also Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837, 843 (1st Cir.1988).

■ Laws that have either the *purpose* or *effect* of discriminating against interstate commerce will be struck down as unconstitutional unless the state can establish that there is no reasonable alternative method of safeguarding a legitimate local interest. *Wyoming v. Oklahoma*, — U.S. at —, 112 S.Ct. at 800; *New Energy*, 486 U.S. at 274, 108 S.Ct. at 1807–08; *Maine v. Taylor*, 477 U.S. 131, 138, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110 (1986) (citing *Hughes v. Oklahoma*, 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979)). State laws which have as their primary or exclusive purpose the promotion of local interests by burdening out-of-state commerce, that is, economic protectionism, are subject to a virtual "per se rule of invalidity." *Wyoming v. Oklahoma*, — U.S. at —, 112 S.Ct. at 800 (quoting *Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535–36, 57 L.Ed.2d 475 (1978)).

■ In the absence of discrimination, state action that interferes with or burdens interstate commerce will be struck down if the local interest is not very substantial or if the burdens imposed on interstate commerce are excessive in relation to the putative benefits of the state's action. *Maine v. Taylor*, 477 U.S. at 138, 106 S.Ct. at 2447; *Brown–Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986); *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970); *Hyde Park*, 839 F.2d at 844–45. Thus, when a state law regulates in-state and out-of-state businesses evenhandedly, courts should apply "less strict scrutiny" or a more lenient balancing test than they would apply in the case of discrimination against interstate commerce. *Wyoming v. Oklahoma*, — U.S. at — n. 12, 112 S.Ct. at 800 n. 12; *Brown–Forman*, 476 U.S. at 579, 106 S.Ct. at 2084; *Philadelphia v. New Jersey*, 437 U.S. at 624, 98 S.Ct. at 2535–36.

### 1. *Discrimination Against Interstate Commerce*

■ R.I.Gen.Laws § 31–5.1–4.2 does not have the purpose of discriminating against interstate commerce. As discussed above, R.I.Gen.Laws § 31–5.1 is designed to regulate automobile dealerships in the state of Rhode Island, and R.I.Gen.Laws § 31–5.1–4.2, in particular, is designed to insure that certain conditions are met before a new dealership license is granted. Rhode Island's intent is to protect Rhode Island consumers and Rhode Island dealers from certain franchising practices of automobile manufacturers which are perceived as harmful to the local community. R.I.Gen.Laws § 31–5.1–4.2 is not designed to promote local dealers at the expense of out-of-state dealers nor to alter the terms at which dealers sell, or consumers purchase, cars within or outside of Rhode Island.

In addition, the exclusion from licensing hearings of out-of-state but not in-state dealers within a given area is not facially discrim-

inatory against interstate commerce such that "on its face [it] appears to violate the cardinal requirement of nondiscrimination." *New Energy*, 486 U.S. at 274, 108 S.Ct. at 1808; *Healy v. The Beer Institute*, 491 U.S. 324, 340–41, 109 S.Ct. 2491, 2501–02, 105 L.Ed.2d 275 (1989). R.I.Gen.Laws § 31–5.1–4.2 is strictly concerned with licensing dealerships in Rhode Island; it does not, on its face, regulate any aspect of interstate commerce such as the flow of goods across borders, the sale of out-of-state goods, the comparative cost of making or selling those goods, or any other aspect of the commercial activity of out-of-state businesses. *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 126, 98 S.Ct. 2207, 2214, 57 L.Ed.2d 91 (1978) (noting that a Maryland law prohibiting producers and refiners of petroleum products from operating retail service stations within the state was distinguishable from laws discriminating against interstate commerce because the law "creates no barriers whatsoever against interstate independent dealers; it does not prohibit the flow of interstate goods, place added costs upon them, or distinguish between in-state and out-of-state companies in the retail market"). Because Rhode Island's new car dealership law does not facially apply to interstate commerce, it cannot facially discriminate against interstate commerce.

■ We therefore turn to the alleged discriminatory *effect* of Rhode Island's new dealership law. R.I.Gen.Laws § 31–5.1–4.2 does not place burdens on goods or services from out-of-state or on the out-of-state businesses that produce them. The statute concerns the rights and obligations of licensed Rhode Island dealerships, a group that does not include Fireside. It simply has no application whatsoever to Fireside. The statute in no way hinders Fireside's ability to sell cars to Rhode Islanders; nor does it increase Fireside's cost of doing business with Rhode Island. These facts distinguish Rhode Island's statute from those statutes which the Supreme Court has commonly struck down because of their discriminatory effects. *See, e.g., Healy*, 491 U.S. at 337–40, 109 S.Ct. at 2500–01 (striking down Connecticut statute requiring beer shippers to affirm that their prices are no higher than prices in bordering

states because the statute affected prices outside of the state); *Hughes v. Oklahoma*, 441 U.S. 322, 336–38, 99 S.Ct. 1727, 1736–37, 60 L.Ed.2d 250 (1979) (striking down Oklahoma statute prohibiting the sale of minnows outside of the state because it blocked the flow of commerce through state borders); *Philadelphia v. New Jersey*, 437 U.S. at 625–28, 98 S.Ct. at 2536–38 (striking down New Jersey law prohibiting the shipment of garbage into the state for the same reason); *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 349–352, 97 S.Ct. 2434, 2444–46, 53 L.Ed.2d 383 (1977) (striking down North Carolina law that restricted grade identifications on closed apple containers, including the favorable grade for Washington apples, because the law raised the cost of doing business in North Carolina for Washington apple growers and stripped away the competitive advantage of the Washington apple industry). Rhode Island's law clearly does not have the effect of burdening out-of-state businesses.

Instead, this case falls into the "local benefit" or "subsidy" category of cases—that is, cases dealing with state laws that confer a benefit on businesses within the state while withholding the benefit from similarly situated out-of-state businesses. Fireside claims that R.I.Gen.Laws § 31–5.1–4.2 grants to Rhode Island dealerships the privilege of protesting the establishment of new car dealerships at locations close to their existing dealerships, thus allowing them an opportunity to limit their competition. At the same time, Fireside argues, R.I.Gen.Laws § 31–5.1–4.2 denies the same privilege to out-of-state dealers in the same competitive area. The result of such discriminatory effects, Fireside alleges, is to drive the establishment of new car dealerships out towards Rhode Island's borders where they can divert businesses from dealers in neighboring states who have no standing to protest the establishment of such dealerships at a good-cause hearing.

Supreme Court jurisprudence on discriminatory privileges for in-state business under the Commerce Clause is, unfortunately, somewhat inconsistent. On the one hand, several state laws designed to promote local

industry have been struck down by the Court. *E.g., Wyoming v. Oklahoma*, —— U.S. at ——, 112 S.Ct. at 800 (striking down Oklahoma law reserving a segment of the Oklahoma coal market for Oklahoma-mined coal); *New Energy*, 486 U.S. at 273–80, 108 S.Ct. at 1807–11 (striking down Ohio tax credit for ethanol produced in the state); *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984) (striking down Hawaiian law exempting local producers of certain liquors from general liquor tax). On the other hand, the Court has repeatedly affirmed the long-recognized proposition that states may directly subsidize local industry as long as they do so without burdening the ability of interstate competitors to sell their products in the state. *New Energy*, 486 U.S. at 278, 108 S.Ct. at 1810; *Bacchus*, 468 U.S. at 271, 104 S.Ct. at 3055; *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 814–17, 96 S.Ct. 2488, 2500–01, 49 L.Ed.2d 220 (1976) (Stevens, J., concurring);[4] *see also West Lynn Creamery, Inc. v. Healy*, —— U.S. ——, ——, 114 S.Ct. 2205, 2220, 129 L.Ed.2d 157 (1994) (Scalia, J., concurring) (describing this area of the Court's Commerce Clause jurisprudence as a "quagmire"). As Justice Scalia stated in *New Energy:*

> The Commerce Clause does not prohibit all state action designed to give its residents an advantage in the marketplace, but only action of that description *in connection with the State's regulation of interstate commerce.* Direct subsidization of domestic industry does not ordinarily run afoul of that prohibition; discriminatory taxation of out-of-state manufacturers does.

*New Energy*, 486 U.S. at 278, 108 S.Ct. at 1810 (emphasis in original).

Although we see no practical difference between the tax break offered to local liquor producers in *Bacchus*, for example, and a "direct" cash subsidy to those same industries (thus blurring the imaginary line between discriminatory privileges that burden interstate commerce and those that do not), the Court's focus on laws "in connection with the State's regulation of interstate commerce" appears to invoke the Commerce Clause only where the challenged law relates to taxes, prices, or the conditions and costs imposed on an out-state-business doing business in the state. *See Exxon Corp.*, 437 U.S. at 126, 98 S.Ct. at 2214; *West Lynn Creamery*, —— U.S. at ——, 114 S.Ct. at 2211–13.

R.I.Gen.Laws § 31–5.1–4.2 does bestow the benefit of protesting new dealerships on existing Rhode Island dealers in a competitive area which is not simultaneously extended to Fireside or other out-of-state dealers who are also in the competitive area. This "advantage in the marketplace," however, is not one "in connection with the state's regulation of interstate commerce." *New Energy*, 486 U.S. at 278, 108 S.Ct. at 1810. The creation of new car dealerships in Rhode Island does not relate to the price of the automobiles being sold, the taxes paid for them, or the costs and conditions of selling them. Moreover, Rhode Island's procedure for protesting new dealerships does not diminish the opportunities for Massachusetts dealers to sell cars to Rhode Island customers. Rhode Island's efforts to license and regulate in-state dealers is thus far afield from protectionist laws that serve to enhance economic prosperity of local citizens by hindering the free flow of products or by affording privileges provided at the expense of out-of-state businesses.

Fireside claims that denying it the protest privilege provided by R.I.Gen.Laws § 31–5.1–4.2 will have a differential effect on the number of competitors a given car dealership will face, ultimately reducing the number of Rhode Islanders who will travel to Massachusetts to buy shiny new Nissan 380–Z's. This diversionary effect is present in all subsidy cases and, thus, cannot by itself estab-

---

4. Although the majority decided *Alexandria Scrap* according to what has become known as the "market participant" doctrine—i.e., normal Commerce Clause scrutiny does not apply when the state enters the market as a buyer, seller, or employer to favor local citizens, *Alexandria Scrap*, 426 U.S. at 805–10, 96 S.Ct. at 2495–98— the majority also placed some emphasis on the fact that Maryland's beneficial treatment of only in-state businesses, while affecting the flow of interstate commerce, did not "interfere[ ] with the natural functioning of the interstate market either through prohibition or through burdensome regulation." *Id.* at 806, 96 S.Ct. at 2496.

lish a violation of the Commerce Clause. In this case, the diversion of business does not result from a comparative advantage in the marketplace created by the challenged state action that would not normally exist in a free market for new car sales. Consequently, this case does not involve a practice that even comes close to the types of local subsidies that raise Commerce Clause concerns. *See Hunt v. Washington State Apple,* 432 U.S. at 351–52, 97 S.Ct. at 2445–46 (striking down North Carolina law because it stripped away advantages that out-of-state competitor would normally have in the free market); *Hyde Park,* 839 F.2d at 843 ("state action must not 'neutralize the economic consequences of free trade among the states'") (quoting *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 526, 55 S.Ct. 497, 501, 79 L.Ed. 1032 (1935)).

The mere act of granting a dealership license that might not otherwise be granted had out-of-state dealers been allowed to protest at the hearing does not mean that the new dealership will have some preferential ability to sell cars to Rhode Island customers. Similarly, nothing in R.I.Gen.Laws § 31–5.1–4.2 affects Fireside's ability to sell a shinier Nissan at a better price, and a Rhode Islander's ability to take advantage of such bargains. The effect of the law is not to dictate the terms of competition between businesses, but rather, to regulate the existence of competitors. Given these circumstances, the fact that some theoretical group of Rhode Island dealers in the interior of the state face less competition from new dealerships allegedly concentrated on the border is not significant for purposes of a Commerce Clause analysis. The alleged beneficial effect of R.I.Gen.Laws § 31–5.1–4.2 is too far afield from the protectionism that the Commerce Clause prohibits.

This case is distinguishable from the *Bendix* case relied on by Fireside for the proposition that the withholding of "legal defenses or like privileges" from out-of-state businesses discriminates against interstate commerce. *Bendix Autolite Corp. v. Midwesco Enters., Inc.,* 486 U.S. 888, 893, 108 S.Ct. 2218, 2222, 100 L.Ed.2d 896 (1988). In *Bendix,* the Supreme Court struck down an Ohio statute that tolled the statute of limitations (i.e. suspended the running of time) on fraud and breach of contract actions for any foreign business that was not "present" in the state and had not designated an agent for service of process. *Id.* To begin with, the Supreme Court never determined whether or not the Ohio statute discriminated against interstate commerce. *Id.* at 891, 108 S.Ct. at 2221. Instead, the Court based its finding on a balancing of the burdens of the law with the justifications for the law. *Id.* In any event, *Bendix* is not applicable to the present case for a number of reasons.

First, the *Bendix* Court found that the Ohio statute places a "significant burden" on out-of-state businesses because it "forces a foreign corporation to choose between exposure to the general jurisdiction of Ohio courts or forfeiture of the limitations defense, remaining subject to suit in Ohio in perpetuity." *Id.* at 893, 108 S.Ct. at 2221. The statute thus affected the costs and conditions of doing business in the state relative to local businesses.

As already noted, that is not the case here. Fireside does not face any increased liability, or other burden that would increase its cost of doing business, by virtue of its exclusion from the licensing hearings. The only effect of R.I.Gen.Laws § 31–5.1–4.2 on Fireside is a relative limitation on its ability to restrict the number of competitors it will face, an interest beyond the purview of the Commerce Clause. Legal defenses in contract or fraud actions are simply not comparable to participation in a local hearing for the granting of a state dealership license to a completely different party. The former involves "an integral part of the legal system ... relied upon to project the liabilities of persons and corporations active in the commercial sphere." *Id.* The latter involves local licensing proceedings that have nothing to do with the out-of-state business beyond its concern over the creation of a competitor.

Furthermore, the alleged protest right in this case, unlike the statute of limitations defense in *Bendix,* is not part of a statutory scheme that applies to out-of-state businesses. As discussed above, R.I.Gen.Laws § 31–5.1–4.2 is concerned with local licenses and

simply has no application to Fireside. The statute of limitations defense, however, is a part of the general scheme of civil commercial liability that applies to all companies with minimum contacts to the state. The Ohio statute was thus purposefully directed to out-of-state businesses to revoke a procedural defense they would normally enjoy. In the present case, no benefit was revoked or withheld from out-of-state parties because R.I.Gen.Laws § 31–5.1–4.2 was concerned solely with local dealership licensing and was never intended to afford any benefits to out-of-state dealers in the first place.

### 2. *Impermissible Burdening of Interstate Commerce*

▮ Because we find no discriminatory purpose or effect on interstate commerce from R.I.Gen.Laws § 31–5.1–4.2, we must apply the more lenient *Pike* balancing test to determine whether the law imposes an unreasonable burden on interstate commerce. Laws that have only an incidental impact on interstate commerce will be upheld so long as the burden imposed on interstate commerce is not clearly excessive in relation to the putative benefits. *Brown–Forman,* 476 U.S. at 579, 106 S.Ct. at 2084; *Philadelphia v. New Jersey,* 437 U.S. at 623–24, 98 S.Ct. at 2535–36; *Pike,* 397 U.S. at 142, 90 S.Ct. at 847. " '[T]here is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it.' " *Kassel v. Consolidated Freightways Corp.,* 450 U.S. 662, 669, 101 S.Ct. 1309, 1316, 67 L.Ed.2d 580 (1981) (quoting *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 767, 65 S.Ct. 1515, 1519, 89 L.Ed. 1915 (1945)).

▮ R.I.Gen.Laws § 31–5.1–4.2 burdens interstate commerce only minimally, if at all. As discussed above, no burdens are placed on an out-of-state dealer's ability to sell cars to Rhode Islanders. The only effect on interstate commerce, theoretically anyway, appears to be a decrease in the number of Rhode Island customers who go to Massachusetts to buy Nissans because out-of-state dealers are not able to protest the establishment of new Rhode Island dealerships near

the border. This diversionary effect, however, attributable to increased competition from competitors who gain no special competitive advantage from the state action, does not implicate the Commerce Clause. The free flow of goods remains unaffected by R.I.Gen. Laws § 31–5.1–4.2 and any changes in that flows are due solely to consumers acting within the free market. *See Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 473–74, 101 S.Ct. 715, 728–29, 66 L.Ed.2d 659 (1981) (upholding Minnesota law banning the use of plastic milk containers even though the statute benefitted the predominantly local pulpwood producers at the expense of the predominantly out-of-state plastics industry); *Exxon Corp.,* 437 U.S. at 126–28, 98 S.Ct. at 2214–15 (upholding Maryland statute prohibiting producers and refiners of petroleum products from operating retail service stations within the state partly because "in-state independent dealers will have no competitive advantage over out-of-state dealers").

Given the lack of any significant burden on interstate commerce in this case, we find Rhode Island's interest in excluding out-of-state parties from participating in a matter of strictly local concern—the licensing of Rhode Island dealerships—more than sufficient to pass Constitutional muster under the *Pike* balancing test. Certainly the state's desire to protect local dealers and consumers from harmful franchising practices is a lawful legislative goal. Even if we confine our analysis to state interests that are directly tied to the restriction on who can participate in hearings, however, the statute survives the balancing test. Rhode Island's concerns for administrative convenience and the reasonable belief that state citizens are best qualified to represent local interests sufficiently justify the state's exclusion of out-of-state dealers from the new dealership hearings.

### B. *Other Constitutional Claims*

### 1. *Due Process*

▮ Fireside claims that RIDOT's exclusion of Fireside from new dealership hearings deprived it of a protected property interest without procedural due process. The district court rejected this claim, finding that Fireside had no protectable interest in pur-

suing its business free from competition. On appeal, Fireside argues that it has a protected property interest in the form of a legitimate claim of entitlement to be free from "excessive intrabrand competition" in the market for new Nissans. Fireside maintains that R.I.Gen.Laws § 31–5.1–4.2 granted this interest to Fireside when it bestowed protest rights on all dealers within the "relevant market area" and that RIDOT then deprived Fireside of this right when it excluded Fireside from the hearings.

The protections of procedural due process are not triggered unless Fireside can show it has been deprived of a protectable liberty or property interest. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985); *Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). Property interests " 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.' " *Loudermill,* 470 U.S. at 538, 105 S.Ct. at 1491 (quoting *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709).

Fireside does not have a protectable property interest in being free from excessive intrabrand competition or from participating in Rhode Island's new dealership hearings because R.I.Gen.Laws § 31–5.1–4.2 does not confer any protections or rights of participation on out-of-state dealers. As we have already found, Rhode Island's dealership licensing statute only applies to dealerships within the state of Rhode Island and does not have, nor has it ever had, any application to out-of-state dealers like Fireside. Consequently, RIDOT did not deprive Fireside of any existing property interest when it excluded Fireside from its hearing on the establishment of Smithfield Nissan. The district court correctly found no due process violation in this case.

### 2. *Equal Protection*

Fireside finally claims that RIDOT's exclusion of similarly situated out-of-state dealers from new dealership hearings is an impermissible classification under the Equal Protection Clause of the Constitution.

Absent a suspect classification or a fundamental right, courts will uphold economic and social legislation that distinguishes between two similarly situated groups as long as the classification is rationally related to a legitimate government objective. *Nordlinger v. Hahn,* —— U.S. ——, ——–——, 112 S.Ct. 2326, 2331–32, 120 L.Ed.2d 1 (1992); *Schweiker v. Wilson,* 450 U.S. 221, 230, 101 S.Ct. 1074, 1080–81, 67 L.Ed.2d 186 (1981); *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161–62, 25 L.Ed.2d 491 (1970); *LCM Enterprises, Inc. v. Town of Dartmouth,* 14 F.3d 675, 678–79 (1st Cir. 1994). A state statute will survive this "rational basis" scrutiny under the Equal Protection Clause as long as "any state of facts reasonably may be conceived to justify it." *Dandridge,* 397 U.S. at 485, 90 S.Ct. at 1161 (quoting *McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961)); *accord LCM Enters.,* 14 F.3d at 679 (collecting cases). A state's classification is not unconstitutional simply because it " 'is not made with mathematical nicety or because in practice it results in some inequality.' " *Dandridge,* 397 U.S. at 485, 90 S.Ct. at 1161 (quoting *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911)).

Fireside claims that RIDOT's application of R.I.Gen.Laws § 31–5.1–4.2 is not rationally related to the stated goal of protecting Rhode Island consumers and Rhode Island dealerships from certain franchising practices of automobile manufacturers. Fireside argues that excluding out-of-state dealers from the good-cause hearings not only fails to further the goals of protecting consumers and dealers but actually undermines those goals. According to Fireside, its exclusion from the hearings gives Rhode Island regulators a distorted view of the "relevant market area" by understating the existing competition among automobile franchises, resulting in licensing decisions that are detrimental to Rhode Island consumers and dealers. The only purpose for excluding out-of-state dealers, Fireside posits, is the illegitimate one of economic protectionism.

We disagree with Fireside's contention that RIDOT's exclusion of Fireside bears no rational relationship to the goal of protecting

Rhode Island consumers and car dealers. Excluding out-of-state parties from hearings on matters of strictly local concern is a reasonable way to conduct state governmental business. We find it reasonable for Rhode Island to believe, rightly or wrongly, that members of its own community are best qualified to represent community interests to regulators, including interests concerning the effect of a manufacturer's efforts to establish a new dealership on existing dealers and consumers. Out-of-state parties may be more likely to have interests that conflict with local interests. Further, Rhode Island's interest in administrative convenience may justify its decision to cut off the number of people participating in state decisionmaking at the logical point of state citizenship. Whether more information concerning out-of-state dealers would better serve Rhode Island's goal of protecting consumers and dealers is irrelevant for purposes of rational basis analysis under the Equal Protection Clause. In any event, we are skeptical of the proposition that Rhode Island consumers and dealers are unable to fully represent their own interests at a hearing without the participation of out-of-state dealers. If an existing Rhode Island dealer or a consumer group finds it in their interest to present information about other out-of-state dealerships, nothing in the law prevents them from doing so.

Finally, we find that Rhode Island did not purposefully discriminate against Fireside by excluding it from new dealership hearings for the sole purpose of furthering the illegitimate goal of economic protectionism. *See Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944). As already discussed above, R.I.Gen.Laws § 31–5.1–4.2 was designed and intended to regulate and protect licensed car dealerships in Rhode Island and was not intended nor designed to benefit local businesses at the expense of out-of-state competitors. We therefore uphold the district court's holding that RIDOT did not violate Fireside's constitutional rights.

*Affirmed.*