Docket Nos. 101585, 101601 cons.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

GENERAL MOTORS CORPORATION *et al.*, Appellants, v. THE STATE OF ILLINOIS MOTOR VEHICLE REVIEW BOARD *et al.*, Appellees.

*Opinion filed January 8, 2007.*

CHIEF JUSTICE THOMAS delivered the judgment of the court, with opinion.

Justices Freeman, Fitzgerald, Kilbride, Garman, and Burke concurred in the judgment and opinion.

Justice Karmeier dissented, with opinion.

## OPINION

In this case, General Motors Corporation (GMC) sought to add two new automobile dealerships in the greater Chicago area: one on Chicago's far west side at Jacobs Twin Buick (Jacobs) and the other in Glenview, Illinois, at Loren Pontiac-Buick (Loren). Various existing GMC dealerships challenged the newly proposed dealerships by filing a protest with the State of Illinois Motor Vehicle Review Board (Board) pursuant to the Motor Vehicle Franchise Act (Franchise Act or Act) (815 ILCS 710/1 *et seq.* (West 2004)), which

allows an existing dealer to file a protest when a manufacturer attempts to locate a new franchise within an existing dealer's relevant market area. It is undisputed that the proposed sites for the additional franchises (add points) were within the protesting dealers' relevant market area. The Board granted the protests, and the circuit court of Sangamon County confirmed that decision. GMC and Loren appealed, arguing that the Board failed to apply the Act's "good cause" standard in reaching its decision to grant the protests. GMC and Loren also argued that the Act is unconstitutional and that the Board's decision was against the manifest weight of the evidence. The appellate court rejected GMC's and Loren's arguments, with one justice dissenting. 361 Ill. App. 3d 271. We allowed the petitions for leave to appeal filed by GMC and Loren and have consolidated the cases. 210 Ill. 2d R. 315. We also allowed various organizations to file *amicus curiae* briefs on behalf of the respective parties. Loren has adopted the briefs of GMC before this court.

### BACKGROUND

Illinois' Motor Vehicle Franchise Act is comparable to legislation adopted by a number of states designed to protect existing dealers and consumers from the negative impact of aggressive franchising practices by automobile manufacturers whose desires to establish excessive competing franchises are considered to be a potential threat to the public welfare. See *Fireside Nissan, Inc. v. Fanning*, 30 F.3d 206, 211 (1st Cir. 1994); 2 Franchise & Distribution L. & Prac. §14:31 (1990). Most of the states having such legislation allow existing dealers of the same line make that are within a specified distance of a proposed new dealership to protest. These statutes generally provide that no new franchise may be established unless the trier of fact, usually a motor vehicle review board, decides that the appointment is for "good cause," which requires the assessment of a number of statutory factors to make that determination. See, *e.g.*, Ark. Code Ann. §23–112–311 (West 2004); Cal. Vehicle Code §3062

(Deering Supp. 2006); Conn. Gen. Stat. Ann. §42–133dd (West Supp. 2006); Mass. Gen. Laws Ann. 93B §6 (West 2005).[1]

Our Franchise Act requires a manufacturer wishing to grant an additional franchise in the relevant market area of an existing franchise of the same line make to give 60 days written notice to each existing dealer of the same line make whose relevant market area includes the proposed location. 815 ILCS 710/4(e)(8) (West 2004). The "[r]elevant [m]arket [a]rea" for purposes of this case is defined by statute as "the area within a radius of 10 miles from the principal location of a franchise or dealership." 815 ILCS 710/2(q) (West 2004). An existing franchise has 30 days from the receipt of the notice from the manufacturer to file a protest with the Board. 815 ILCS 710/4(e)(8) (West 2004). If a protest is filed, the manufacturer has the burden of proof to establish that "good cause" exists to allow the grant or establishment of the additional franchise. 815 ILCS 710/4(e)(8) (West 2004).

Section 4(e)(8) of the Act provides that the determination of whether "good cause" exists for allowing an additional franchise "shall be made by the Board under subsection (c) of Section 12 of this Act." 815 ILCS 710/4(e)(8), 12(c) (West 2004). Section 12(c) provides that, in considering whether "good cause" has been established for granting a proposed additional franchise, the Board shall consider "all relevant circumstances" in accordance with subsection (v) of section 2 of this Act, including but not limited to, 11 statutory factors set forth in section 12(c) (815 ILCS 710/12(c) (West 2004)). Section 2(v) of the Act is part of the definitions section of the statute and provides that " '[g]ood cause' means facts establishing commercial reasonableness in lawful or privileged competition and business practices as defined at common law." 815 ILCS 710/2(v) (West 2004). The "relevant circumstances" that the Board is required to consider are listed in section 12(c) as follows:

---

[1]Thirty-two states currently have motor vehicle franchise statutes that allow existing dealerships of the same line make within a specified distance of a proposed new dealership to file a protest to resolve whether a new dealer may be added, and thirty of those states have a "good cause" standard.

"(1) whether the establishment of such additional franchise or the relocation of such motor vehicle dealership is warranted by economic and marketing conditions including anticipated future changes;

(2) the retail sales and service business transacted by the objecting motor vehicle dealer or dealers and other motor vehicle dealers of the same line make with a place of business in the relevant market area to be served by the additional franchise or the relocated motor vehicle dealership during the 5 year period immediately preceding such notice as compared to the business available to them;

(3) the investment necessarily made and obligations incurred by the objecting motor vehicle dealer or dealers and other motor vehicle dealers of the same line make with a place of business in the relevant market area to be served by the additional franchise or the relocated motor vehicle dealership to perform their obligations under existing franchises or selling agreements; and, the manufacturer shall give reasonable credit for sales of factory repurchase vehicles purchased by the objecting motor vehicle dealer or dealers and other motor vehicle dealers of the same line make with the place of business in the relevant market area to be served by the additional franchise or the relocated motor vehicle dealership, or the additional motor vehicle dealership or other facility limited to the sale of factory repurchase or late model vehicles, at manufacturer authorized or sponsored auctions in determining performance of obligations under existing franchises or selling agreements relating to total new vehicle sales;

(4) the permanency of the investment of the objecting motor vehicle dealer or dealers and other motor vehicle dealers of the same line make with a place of business in the relevant market area to be served by the additional franchise or the relocated motor vehicle dealership;

(5) whether it is beneficial or injurious to the public welfare for an additional franchise or relocated motor vehicle dealership to be established;

(6) whether the objecting motor vehicle dealer or dealers and other motor vehicle dealers of the same line make with a place of business in the relevant market area to be served by the additional franchisee or relocated motor vehicle dealership are providing adequate competition and convenient consumer care for the motor vehicles of the same line make owned or operated in the area to be served by the additional franchise or relocated motor vehicle dealership;

(7) whether the objecting motor vehicle dealer or dealers and other motor vehicle dealers of the same line make with a place of business in the relevant market area to be served by the additional franchisee or the relocated motor vehicle dealership have adequate motor vehicle sales and service facilities, equipment, vehicle parts and qualified personnel to reasonably provide for the needs of the customer; provided, however, that good cause shall not be shown solely by a desire for further market penetration;

(8) whether the establishment of an additional franchise or the relocation of a motor vehicle dealership would be in the public interest;

(9) whether there has been a material breach by a motor vehicle dealer of the existing franchise agreement which creates a substantially detrimental effect upon the distribution of the franchiser's motor vehicles in the affected motor vehicle dealer's relevant market area or fraudulent claims for warranty work, insolvency or inability to pay debts as they mature;

(10) the effect of an additional franchise or relocated motor vehicle dealership upon the existing motor vehicle dealers of the same line make in the relevant market area to be served by the additional franchisee or relocated motor vehicle dealership; and

(11) whether the manufacturer has given reasonable credit to the objecting motor vehicle dealer or dealers and other motor vehicle dealers of the same line make with a place of business in the relevant market area to be served by the additional franchise or relocated motor vehicle dealership or additional motor vehicle dealership or other facility limited to

the sale of factory repurchase or late model vehicles, for retail sales of factory repurchase vehicles purchased by the motor vehicle dealer or dealers at manufacturer authorized or sponsored auctions." 815 ILCS 710/12(c)(1) through (c)(11) (West 2004).

In February and March of 2001, GMC sent notices to all existing dealers in the relevant market area of its two proposed franchise add points. Castle Buick-Pontiac-GMC (Castle) and Grossinger Autoplex, Inc. (Grossinger), filed timely protests with the Board as to the Jacobs site. With respect to the Loren site, timely protests were filed by North Shore, Inc., doing business as Muller Pontiac/GMC Mazda (Muller), Grossinger,[2] and Joe Mitchell/GMC Truck, Inc. (Mitchell). Castle is located five miles from the proposed Jacob's add point. Grossinger is 6.8 miles from the proposed Jacob's add point, and 6.5 miles from the proposed Loren add point. Muller is 4.9 miles from the proposed Loren add point. Within a 10-mile radius of the Jacob's add point, there are three existing GMC dealers, and within a 10-mile radius of the Loren add point, there are also three existing GMC dealerships. In addition, four GMC dealers are located just outside of the 10-mile radius applicable to the Jacob's add point. In all, there are a total of 27 GMC dealerships in the Chicago area.

By agreement of the parties, the cases were consolidated. The transcripts of the hearings are voluminous, and the parties together presented approximately 200 exhibits. The record contains 59 volumes.

In May 2003, the hearing officer entered his findings of fact, conclusions of law, and recommended decision. The hearing officer recommended that the protests against both the Jacobs and Loren add points be upheld and that the Board should not approve the additional GMC franchises. In September 2003, the Board entered a final order that granted the dealers' protests and adopted and incorporated into its final order the findings of fact, the conclusions of law and the recommended decision of the hearing officer. The Board also awarded

[2]Grossinger was located in the relevant market area of both proposed add points and protested both of them.

the protesting dealers attorney fees and costs to be determined at a later hearing.

The circuit court confirmed the decision of the Board. GMC and Loren appealed. The appellate court found that the attorney fees and costs award should not have been entered because it was not yet ripe for resolution and therefore vacated the award. In all other respects, the appellate court affirmed the circuit court's judgment, which upheld the dealers' protests. 361 Ill. App. 3d at 291.

## ANALYSIS

### I. The Good-Cause Standard

GMC first argues before this court that the Board did not apply the Act's "good cause" standard correctly. It points to section 2(v)'s definition of "good cause" as "commercial reasonableness in lawful or privileged competition and business practices as defined at common law." 815 ILCS 710/2(v) (West 2004). It claims that the Board analyzed each of the 11 factors in section 12(c) untethered from section 2(v), even though section 12(c) directs that the 11 factors be considered in accordance with section 2(v). See 815 ILCS 710/12(c) (West 2004). GMC further urges that the terms "good cause" and "commercial reasonableness" should be equated with "good faith." According to GMC, if the evidence shows it acted without any bad faith or malice in its decision to add the new franchises, then its decision should not be second-guessed. GMC contends that "good cause" should be interpreted as a minimal standard and not some "super standard of perfection."

GMC's argument presents a question of statutory interpretation. When presented with an issue of statutory construction, our role is to ascertain and give effect to the intent of the legislature. *People v. Whitney*, 188 Ill. 2d 91, 97 (1999). Legislative intent is best determined from the language of the statute itself, which if unambiguous, should be enforced as written. *Taddeo v. Board of Trustees of the Illinois Municipal Retirement Fund*, 216 Ill. 2d 590, 595 (2005); *Comprehensive Community Solutions, Inc. v. Rockford School District No. 205*, 216 Ill. 2d 455, 473 (2005). In giving effect to the statutory intent, the court should consider, in addition to the statutory language, the reason for the law, the problems to be

remedied, and the objects and purposes sought. *People v. Donoho*, 204 Ill. 2d 159, 171-72 (2003). A statute is ambiguous if it is subject to two or more reasonable interpretations. *Donoho*, 204 Ill. 2d at 172. The construction of a statute by an agency charged with its administration will be given deference where there is a reasonable debate about the meaning of the statute, but that interpretation is not ultimately binding on this court. *Elementary School District 159 v. Schiller*, 221 Ill. 2d 130, 142-43 (2006); *Taddeo*, 216 Ill. 2d 590.

Beginning with the language of the Act, we note that it plainly requires that the Board "shall" consider each of the 11 factors listed in section 12(c), along with any other relevant circumstances, when determining whether "good cause" has been established. This is precisely what the Board did. In reaching its decision to grant the protest of the existing dealerships, the Board set forth the definition of "good cause" in section 2(v), analyzed each of the applicable factors as directed by section 12(c) of the Act, and balanced the various interests at stake. It concluded that each of the factors in section 12(c) favored the protesting dealers, except the circumstance listed in section 12(c)(11), which it found inapplicable to both franchises.

We believe that in enacting the statutory scheme, the legislature clearly intended that the Board's assessment of the 11 factors be equated with "good cause." It also apparent that the legislature intended that the Board balance the dealer's interest in maintaining viable businesses, the manufacturer's interest in promoting sales, and the public's interest in adequate competition and convenient service. See *Fields Jeep-Eagle, Inc. v. Chrysler Corp.*, 163 Ill. 2d 462, 477-78 (1994). This is consistent with the Act's declaration of purpose, which provides as follows:

> "The legislature finds and declares that the distribution and sale of vehicles within this State vitally affects the general economy of the State and the public interest and welfare, and that in order to promote the public interest and welfare, and in the exercise of its police power, it is necessary to regulate motor vehicle manufacturers, distributors, wholesalers and factory or distributor branches or representatives, and to regulate dealers of motor vehicles doing business in this State in order to prevent frauds, impositions and other abuses upon

its citizens, to protect and preserve the investments and properties of the citizens of this State, and to provide adequate and sufficient service to consumers generally." 815 ILCS 710/1.1 (West 2004).

GMC's interpretation would create an absurd result and would render the Act's purpose and the Board's consideration of the 11 statutory factors essentially meaningless. If all that was required was subjective good faith on the part of GMC in making its business decision, it would negate any objective "good cause" analysis. We do not believe that this is what the legislature had in mind when it placed the burden of proving "good cause" on the manufacturer and *required* the assessment of the 11 statutory criteria.

Additionally, if GMC's interpretation were adopted, it would cause the Illinois Motor Vehicle Franchise Act to differ markedly from other state's automobile franchise acts, which simply require an objective assessment of the statutory factors to determine "good cause." See, *e.g.*, Ark. Code Ann. §23–112–311 (West 2004); Cal. Vehicle Code §3062 (Deering Supp. 2006); Conn. Gen. Stat. Ann. §42–133dd (West Supp. 2006); Mass. Gen. Laws Ann. 93B §6 (West 2005).

GMC emphasizes the "lawful or privileged competition" language of the good-cause standard. 815 ILCS 710/2(v) (West 2004). The terms "lawful competition," "privileged competition," "privilege of competition" and "competitor's privilege" appear in the case law and all refer to the same privilege, which is an affirmative defense to the tort of intentional interference with prospective business advantage. See *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 398-99 (7th Cir. 2003); *International Marketing, Ltd. v. Archer-Daniels-Midland Co.*, 192 F.3d 724, 731 (7th Cir. 1999); *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1534 (11th Cir. 1985). It "allows one to divert business from one's competitors generally as well as from one's particular competitors provided one's intent is, at least in part, to further one's business and is not solely motivated by spite or ill will." See *Soderlund Brothers, Inc. v. Carrier Corp.*, 278 Ill. App. 3d 606, 615 (1995).

It is not readily apparent, however, what if anything this affirmative defense has to do with a protest under the Franchise Act. GMC claims that by referring to "privileged competition," the

legislature must have been creating a standard that defers to the manufacturer's business decision absent any evidence of bad faith in reaching that decision. We read the Illinois statutory scheme differently. As the appellate court correctly observed, the standard is not simply "lawful or privileged competition." Instead, the standard is "*commercial reasonableness* in lawful or privileged competition" and requires that the Board "shall" consider the applicable statutory factors listed. (Emphasis added.) 815 ILCS 710/2(v), 12(c) (West 2004).

"Commercial reasonableness" is not specifically defined by the statute; thus, we will look to its commonly understood meaning. Black's Law Dictionary defines "commercially reasonable" as follows: "(Of a property sale) conducted in good faith *and* in accordance with commonly accepted commercial practice." (Emphasis added.) Black's Law Dictionary 286 (8th ed. 2004). Thus, commercial reasonableness includes something more than simply exercising good faith in a business decision. Good faith and commercial reasonableness are not interchangeable terms. See *Original Great American Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 280 (7th Cir. 1992).

One of the clearest explanations we have found for commercial reasonableness was provided by the California appellate court when it attempted to determine whether notice was properly given under a statute that required a "good faith and commercially reasonable effort" in complying with statutory notice requirements. See *Gifford v. J. & A. Holdings*, 54 Cal. App. 4th 996, 63 Cal. Rptr. 2d 253 (1997). There, the court stated that "[c]ommercial reasonableness is not expressly defined in the statute, but has been defined elsewhere to include commonly accepted commercial practices of responsible businesses which afford all parties fair treatment." *Gifford*, 54 Cal. App. 4th at 1005-06, 63 Cal. Rptr. 2d at 259. The court continued by stating that "[g]ood faith and commercial reasonableness primarily involve questions of fact, based on all the circumstances; the trial court's findings must be upheld if supported by substantial evidence." *Gifford*, 54 Cal. App. 4th at 1006, 63 Cal. Rptr. 2d at 259.

Similarly, good faith and commercial reasonableness in the present case were questions of fact for the Board to resolve by assessing and balancing the factors in section 12(c) with an eye toward fair

treatment of the interests involved–the existing dealers, the manufacturer and the consumer public. The legislature specifically placed the burden of proof on the manufacturer to show "good cause" (815 ILCS 710/4(e)(8) (West 2004)), and further provided that "*good cause shall not be shown solely by a desire for further market penetration*." (Emphasis added.) 815 ILCS 710/12(c)(7) (West 2004). GMC essentially asks this court to read this term out of the statute. We decline to do so. Instead, we find that the Board carefully considered the applicable factors and the relevant evidence presented by the parties and concluded that GMC, as the manufacturer, had not met its burden. Accordingly, GMC's argument that the Board applied an erroneous standard must be rejected.

### II. Whether the Board's Decision Was Clearly Erroneous

GMC next argues that the Board's decision was either clearly erroneous or against the manifest weight of the evidence.

The findings and conclusions of an administrative agency on a question of fact shall be held to be *prima facie* true and correct. 735 ILCS 5/3–110 (West 2004). A reviewing court does not reweigh the evidence that was before the agency. *Comprehensive Community Solutions, Inc. v. Rockford School District No. 205*, 216 Ill. 2d 455, 471-72 (2005). An agency's conclusion on a question of mixed law and fact–that is one that asks the legal effect of a given set of facts–is reviewed for clear error. *Elementary School District 159 v. Schiller*, 221 Ill. 2d 130, 143 (2006). Such review is significantly deferential to an agency's experience in construing and applying the statute that it administers. *Schiller*, 221 Ill. 2d at 143. Thus, an agency's decision will only be found to be clearly erroneous where a reviewing court is left, on the entire record, with a definite and firm conviction that a mistake has been committed. *Schiller*, 221 Ill. 2d at 143.

The Board made findings of fact on each of the statutory factors for assessing "good cause" noted above, and did so with respect to each of the two dealerships at issue. The Board's findings of fact were essentially the same for each of the two dealerships. With respect to section 12(c)(1), the Board found that a new dealership was not warranted by economic and marketing conditions, including anticipated future changes. See 815 ILCS 710/12(c)(1) (West 2004).

-11-

It noted that there were already three GMC dealers within a radius of less than 10 miles of both Jacobs and Loren, and that there were seven dealers within 11 miles of Jacobs. Thus, the areas were already substantially represented by GMC. Moreover, the Board found that there was little, if any, projected growth around the dealerships, that there was insufficient evidence that the dealers surrounding Jacobs and Loren were underperforming, and that there was no evidence that the answer to any perceived "underperformance" was to add another dealer. It also found that there was competent evidence that the dealers surrounding Jacobs and Loren suffered from a lack of product allocation and that adding a dealer would only exacerbate the problem.

Regarding section 12(c)(2), the Board found that the retail sales and service business transacted by the protesting dealers and other GMC dealers in the relevant market areas, as compared to the business available to them, was reasonable and therefore favored the protesting dealers. See 815 ILCS 710/12(c)(2) (West 2004). The Board found that GMC's experts used a measure of performance that was unrealistic in the metropolitan, multiple-dealer network at issue. Furthermore, GMC presented insufficient evidence to support the argument that the local dealers around Jacobs and Loren were failing to adequately perform.

With respect to sections 12(c)(3) and (c)(4), the Board found that the protesting dealers and other GMC dealers in the relevant market area had made substantial and permanent investments. See 815 ILCS 710/12(c)(3), (c)(4) (West 2004). It noted that the protesting dealers had invested millions of dollars in their facilities, particularly Grossinger, who had a $19 million state-of-the-art Autoplex. Additionally, Castle recently spent $5 million to create an exclusive GMC/Buick/Pontiac dealership and was not permitted to add any non-GMC franchises for the next 25 years. Moreover, each of the protesting dealers had shown a commitment to a longstanding and respectable presence in the community.

Regarding sections 12(c)(5) and (c)(8), the Board found that the addition of a new dealer could be injurious to the public welfare and that there appeared to be little or no public benefit that would accrue. See 815 ILCS 710/12(c)(5), (c)(8) (West 2004). It noted that the public would not be served by a dealer network where the individual

dealers are small and lack adequate product to sell. It would be inconvenient for consumers to have to travel to a number of GMC outlets just to be able to see the particular vehicle they are considering. The benefit of being a mile or two closer to the nearest GMC dealer would be incremental at best. Given that already scarce inventory levels would be stretched further by adding another dealer, the public would not be served by the expansion of the dealer network into areas where there were already so many dealers.

With regard to section 12(c)(6), the Board found that the local dealers in the relevant market areas of the proposed Jacob and Loren dealerships were providing adequate competition and convenient care to their customers. See 815 ILCS 710/12(c)(6) (West 2004). According to the Board, Castle, Grossinger, Mitchell and Muller all provided excellent customer service and made every effort to record as many sales as possible. There was insufficient evidence to show that these dealers were failing to perform adequately, but there was competent evidence to show that their performance had been hampered by a lack of adequate product supply.

With respect to section 12(c)(7), the Board found that the protesting dealers in the relevant market areas of both proposed add points had adequate sales and service facilities, equipment, vehicle parts and qualified personnel to reasonably provide for the needs of the customers in the relevant market areas. See 815 ILCS 710/12(c)(7) (West 2004). There was no evidence presented by GMC that any of the protesting dealers, or any other GMC dealers in the relevant market areas, had inadequate sales and service facilities, equipment, vehicle parts or qualified personnel to reasonably serve customers. To the contrary, the sales and service facilities ranged from adequate to state-of-the-art.

The Board next found that there was no evidence of a material breach of any franchise agreement by any protesting dealer in the relevant market areas. See 815 ILCS 710/12(c)(9) (West 2004).

Regarding section 12(c)(10), the Board found that there was competent evidence that the addition of Jacobs as a GMC dealer would hurt the existing dealers in the relevant market area. See 815 ILCS 710/12(c)(10) (West 2004). Similarly, the Board found that the addition of Loren would hurt the existing dealers in the relevant market area. There was insufficient evidence presented to show that

there was enough additional opportunity to support another dealer in either relevant market area. But there was competent evidence to show that existing dealers suffer from inventory shortages caused by GMC's allocation system, and there was no reason to believe that the existing dealers could respond positively to the addition of a new add point without sufficient product supply.

Finally, the Board found section 12(c)(11) to be inapplicable to the case. See 815 ILCS 710/12(c)(11) (West 2004).

After reviewing the evidence presented, we conclude that the Board's decision to grant the existing dealers' protests was not clearly erroneous. The evidence supporting the Board's conclusions on several factors was undisputed. There was unrebutted testimony establishing that the protesting dealers had made substantial investments in their dealerships that were intended to be permanent. See 815 ILCS 710/12(c)(3), (c)(4) (West 2004). Additionally, the evidence was undisputed that the protesting dealers had adequate sales and service facilities. See 815 ILCS 710/12(c)(7) (West 2004). Finally, there was no evidence that any of the protesting dealers had materially breached their franchise agreements. See 815 ILCS 710/12(c)(9) (West 2004). The parties presented conflicting evidence about the factors that focus on public interest and welfare, the economic impact of adding dealerships, and the amount of business available to existing dealers in the relevant market area. See 815 ILCS 710/12(c)(1), (c)(2), (c)(5), (c)(8), (c)(10) (West 2004).

The two experts who testified, James Anderson (GMC's expert) and Dr. John Matthews (the protesting dealers' expert), had significantly different opinions due to their difference in approaches. Anderson's method compared local GMC sales performance with adjusted national and statewide standards. Matthews compared GMC sales performance in the Jacobs relevant market area with all parts of the Chicago metropolitan area outside the Jacobs relevant market area, and he used the same method for Loren.

GMC criticizes Matthews' approach as "circular" because he relied solely on data from the Chicago area. But Matthews' approach offered the advantage of comparing the two relevant market areas to areas that were similar in most respects, including the fact that they were urban, that dealers sold heavily into one another's territories, and that the climate was generally the same. By contrast, Anderson's

adjusted national and state standards took into account data from rural areas, where there was often far less competition and where customer tastes differed from those of customers in major cities like Chicago.

In light of Dr. Matthews' testimony and the other evidence, it was reasonable for the Board to conclude that Anderson's approach was not as valid a method as Dr. Matthew's for measuring dealership performance in a multidealer area in a large metropolitan region. After examining the evidence, the Board was simply not persuaded by GMC's attempt to show that GMC dealers in the two relevant market areas were performing poorly. Instead, the Board found that Dr. Matthews' approach was generally superior, and gave more weight to the testimony he presented on the economic impact of adding the dealerships and the harm this would cause to marginally profitable dealerships like Castle and Muller.

GMC argues that the Board's decision relied in large part upon performance averages for GMC dealers, and assumed a static market. But, as the appellate court majority pointed out, it was GMC who introduced evidence that established average sales as the appropriate measure of performance. 361 Ill. App. 3d at 279. GMC cannot complain of the Board's reliance upon data concerning average sales when GMC itself relied on such data in its effort to meet its burden of establishing good cause to add the dealerships. Moreover, there is nothing in the record indicating that the Board would not have been receptive to evidence indicating likely future improvement in GMC sales at the time of the administrative hearing, which took place in 2002. But the evidence presented to the Board indicated that GMC sales for dealers in the Jacobs and Loren relevant market areas were generally declining at that time. Moreover, this decline occurred even though the protesting dealerships devoted significant resources to advertising and promoting GMC sales.

Evidence that GMC dealers in the two relevant market areas had considerable difficulty getting an adequate supply of product from GMC supported the Board's conclusion that adding the dealerships would not serve the public interest. Many area GMC dealers testified that they had trouble getting an adequate supply from GMC of sport utility vehicles, the vehicles that sell best in the Chicago area. Grossinger general manager Charles Settles stated that GMC makes discretionary allocations of additional vehicles to dealers, but these

-15-

allocations are made in an arbitrary fashion. GMC's vehicle allocation system also had an additional problem in that there was a lapse of 90 to 120 days between the time a vehicle is ordered and its arrival.

According to Dr. Matthews, adding the two dealerships would only exacerbate the existing product supply problems and cause greater inconvenience to GMC customers in the area. Dr. Matthews stated that it was not in the public interest to have small dealers with small inventories, thereby requiring buyers to visit several GMC dealers to see all the vehicles they wanted to view. Furthermore, Dr. Matthews believed that the cross-selling data showed there was adequate competition among GMC dealers in the relevant areas, and he felt that GMC should have fewer and larger dealers in the Chicago area. The evidence also showed that growth was unlikely except for a new housing development called the Glen in the Loren relevant market area. Matthews estimated that this new development would only result in an annual sales increase of five GMC vehicles at most.

Under these circumstances, we find that there was sufficient evidence to support the Board's conclusion that adding the dealerships would not serve the public interest and was not warranted by existing economic conditions when balancing the interests involved. Accordingly, we conclude that the Board's findings should not be disturbed because they were not against the manifest weight of the evidence, and its ultimate conclusion to grant the protests was not clearly erroneous.


III. Vagueness

GMC next argues that the Act is unconstitutionally vague because a manufacturer cannot determine in advance when a dealership can be added to the market. In support of its argument, GMC relies upon *Fields Jeep-Eagle, Inc. v. Chrysler Corp.*, 163 Ill. 2d 462 (1994), where this court held a previous version of the Act unconstitutional on separation of powers grounds.

In determining whether a statute has been shown to be unconstitutional, we begin with the presumption that all statutes are constitutional. *People v. Waid*, 221 Ill. 2d 464, 480 (2006). The burden of rebutting that presumption is on the party challenging the validity of the statute to demonstrate clearly a constitutional violation.

*People v. Greco*, 204 Ill. 2d 400, 406 (2003). If reasonably possible, a statute must be construed so as to affirm its constitutionality and validity. *Greco*, 204 Ill. 2d at 406.

A statute is not unconstitutionally vague if it is explicit enough to serve as a guide to those who must comply with it. *Ardt v. Illinois Department of Professional Regulation*, 154 Ill. 2d 138, 157 (1992). Moreover, a statute is considered unconstitutionally vague only if its terms are so ill-defined that the ultimate decision as to its meaning rests on the opinions and whims of the trier of fact rather than any objective criteria or facts. *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 291 (2003); *People v. Burpo*, 164 Ill. 2d 261, 266 (1995).

As noted above, section 2(v) of the Act defines "good cause" and section 12(c) sets forth 11 circumstances the court must consider in determining "good cause." 815 ILCS 710/2(v), 12(c) (West 2004). Administrative agencies must often resolve similar "cause" questions against vagueness challenges because courts understand that it is difficult for an administrative agency to anticipate every type of conduct that might constitute "good cause." See *Ford Motor Co. v. Motor Vehicle Review Board*, 338 Ill. App. 3d 880, 889 (2003). But the Franchise Act is even more detailed than some statutes that have been upheld because it contains 11 factors for the Board to assess to guide its determination.

In *Piano v. State of California ex rel. New Motor Vehicle Review Board*, 103 Cal. App. 3d 412, 163 Cal. Rptr. 41 (1980), a California court upheld the constitutionality of an automobile franchise statute that is analogous to the Illinois Act, having a "good cause" standard with just five statutory circumstances to consider to aid the determination. The court held that the standards set forth in the statute were adequate to guide those persons to be governed by the act, as well as the hearing officer, the agency and the courts charged with deciding cases under it. *Piano*, 103 Cal. App. 3d at 418, 163 Cal. Rptr. at 44. In so holding, the court noted that fixing any more rigid a standard would subvert the very purpose behind the delegation of authority to the agency–which is to leave the decision to the body with the expertise of handling complicated decisions that depend on " 'the individual and varying local conditions.' " *Piano*, 103 Cal. App. 3d at 418, 163 Cal. Rptr. at 44, quoting *Jenner v. City Council of the City of Covina*, 164 Cal. App. 2d 490, 499, 331 P.2d 176, 182 (1958).

-17-

GMC's reliance on *Fields Jeep-Eagle, Inc. v. Chrysler Corp.*, 163 Ill. 2d 462 (1994), is misplaced. There, this court held an earlier version of the Franchise Act (see Ill. Rev. Stat. 1989, ch. 121½, pars. 754(e)(8), 762(c); see also 815 ILCS 710/4(e)(8), 12(c) (West 1992)) unconstitutional based on separation of powers grounds, finding that courts are not adequately equipped to make the difficult decision of "independently and originally appraising and determining the appropriate location for a business." *Fields*, 163 Ill. 2d at 472. In so doing, this court commented that several of the statutory circumstances that the court is to inquire into are "subjective and/or speculative in nature and involve competing public and private interests." *Fields*, 163 Ill. 2d at 476. GMC seizes upon this language to argue that the statutory scheme is unconstitutionally vague. GMC takes this language from *Fields* out of context, however, because the court was merely making its observation in the context of noting that courts are not equipped to make the statutory determination because it involves a legislative inquiry into the public interest, which could not be delegated to the judiciary. *Fields*, 163 Ill. 2d at 478-79. *Fields* observed that the majority of state statutes provide for a single administrative agency or board to hear and to decide the merits of protests against the establishment of an additional dealership in a particular area. *Fields*, 163 Ill. 2d at 477. The reason that it is best to have a board decide these kinds of issues in the first instance is that "[t]he independent determination of what facts are pertinent and the assessment of those facts as they bear upon whether a business should be allowed to operate at a given location are not functions which courts are generally equipped to perform or with which they should be burdened ***." *Fields*, 163 Ill. 2d at 477.

In response to the *Fields* decision, the legislature amended the Act to create a Motor Vehicle Review Board to hear dealer protests under the Act. 815 ILCS 710/1 *et seq.* (West 1996) (amended by Pub. Act 89–145, eff. July 14, 1995). Nothing in *Fields* indicates that the language of the Act would be unconstitutionally vague if a board were created to hear disputes under the Act. Indeed the opposite conclusion can be drawn from the concluding paragraph of *Fields*, where this court recognized the interest of the State in regulating the dealings of motor vehicle manufacturers and dealers so as to redress the disparity in economic and bargaining power between manufacturers and their

-18-

franchises. *Fields*, 163 Ill. 2d at 479-80. The court in *Fields* concluded that it was aware that numerous states have enacted regulatory legislation requiring a determination of whether to allow the establishment of a dealership based on the same or similar factors as those set out in section 12(c) of the Act. *Fields*, 163 Ill. 2d at 480.

GMC does not cite any case holding a "good cause" standard unconstitutionally vague where an agency's decision was guided by a list of statutory factors to aid its determination. Nor does GMC offer any persuasive argument to support its position. Accordingly, we find that the Act's standard for making a "good cause" determination is not unconstitutionally vague.


IV. Commerce Clause

GMC next argues that the Franchise Act violates the commerce clause of the United States Constitution (U.S. Const., art. I, §8, cl. 3). According to GMC, the statute improperly favors purely local interests over interstate commerce because it contains a provision that states that "good cause shall not be shown solely by a desire for further market penetration." See 815 ILCS 710/12(c)(7) (West 2004).

A state statute is valid under the commerce clause if it evenhandedly effectuates a legitimate local public interest, the effect on interstate commerce is only incidental, and the burden on commerce is not clearly excessive to the local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 25 L. Ed. 2d 174, 178, 90 S. Ct. 844, 847 (1970). If a legitimate local purpose is found, then the question becomes one of degree: the extent of the burden that will be tolerated will depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. *Pike*, 397 U.S. at 142, 25 L. Ed. 2d at 178, 90 S. Ct. at 847.

The United States Supreme Court has upheld the constitutionality of a California automobile franchise statute that is similar to Illinois' statute, finding a disparity of bargaining power between automobile manufacturers and their franchisees, and holding that such laws promote fair dealing and protect small businesses. *New Motor Vehicle Board v. Orrin W. Fox Co.*, 439 U.S. 96, 100-02, 58 L. Ed. 2d 361, 370-71, 99 S. Ct. 403, 407-08 (1978). Additionally, the Fourth Circuit

Court of Appeals relied upon *Orrin Fox* and upheld a franchise statute against a commerce clause challenge where the statute prohibited establishment of an automobile franchise if the State Commissioner of Motor Vehicles determined the market could not support all of the dealerships. *American Motor Sales Corp. v. Division of Motor Vehicles of Commonwealth of Virginia*, 592 F.2d 219 (4th Cir. 1979).

We find that our Franchise Act serves the same legitimate public interests noted in *Orrin Fox* and *American Motors Sales*. See also *Fireside Nissan*, 30 F.3d at 218 ("Certainly the state's desire to protect local dealers and consumers from harmful franchising practices is a lawful legislative goal"). Thus, we find that the Franchise Act effectuates a legitimate local interest under the *Pike* test.

The cases relied upon by GMC to support its commerce clause argument are either distinguishable or unpersuasive. See *General GMC Trucks, Inc. v. General Motors Corp.*, 239 Ga. 373, 377, 237 S.E.2d 194, 197 (1977); *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 530-31, 93 L. Ed. 865, 870, 69 S. Ct. 657, 661 (1949); *Buck v. Kuykendall*, 267 U.S. 307, 313, 69 L. Ed. 623, 625, 45 S. Ct. 324, 325 (1925). In *General GMC Trucks*, the Georgia Supreme Court found its state's automobile franchise statute unconstitutional because it did not effectuate a public interest. *General GMC Trucks, Inc.*, 239 Ga. at 377, 237 S.E.2d at 197. The case was decided, however, before the United States Supreme Court rendered its decision in *Orrin Fox*, which expressly found the protection of existing new-car dealers to be a legitimate purpose. Thus, the Georgia Supreme Court's decision is of limited value.

*Buck* is distinguishable because the Franchise Act does not distinguish between out-of-state and in-state manufacturers and therefore it regulates evenhandedly. In contrast, the statute in *Buck* applied to common carriers engaged exclusively in interstate commerce. *Buck*, 267 U.S. at 313, 69 L. Ed. at 625, 45 S. Ct. at 325.

*H.P. Hood* is also distinguishable. There, the avowed purpose of a law regulating the milk industry was economic isolation and the curtailment of the volume of interstate commerce. *H.P. Hood & Sons, Inc.*, 336 U.S. at 530-31, 93 L. Ed. at 870, 69 S. Ct. at 661. In the present case, the Franchise Act has the legitimate purpose of redressing the disparity in bargaining power between manufacturers

and their franchisees, and there has been no showing of any decrease in interstate commerce.

Finally, we conclude that the Franchise Act passes constitutional muster under the *Pike* test because any burden that the Act places on interstate commerce is not clearly excessive in relation to the local benefits. As the appellate court noted,

> "In finding that the Virginia statute did not impose such a burden, the Fourth Circuit noted that even with the statute, the manufacturer and its competitors can still supply the market area with all the vehicles it can absorb, and the public can still buy the manufacturer's brand from the existing dealership or choose to buy a competitive brand. *American Motors*, 592 F.2d at 223. It also noted that in addressing the antitrust issue in *New Motors*, the Supreme Court recognized the California Act did have an anticompetitive effect but noted that ' " 'if an adverse effect on competition were, in and of itself, enough to render a state statute invalid, the States' power to engage in economic regulation would be effectively destroyed.' " ' *American Motors*, 592 F.2d at 224, quoting *New Motor*, 439 U.S. at 111, 58 L. Ed. 2d at 376-77, 99 S. Ct. at 412, quoting *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 133, 57 L. Ed. 2d 91, 105, 98 S. Ct. 2207, 2218 (1978). Thus, the Fourth Circuit noted something in addition to such a restraint on competition must be shown to establish an unconstitutional burden on interstate commerce, and there, no other effect than a restriction of intrabrand competition was demonstrated." 361 Ill. App. 3d at 286-87, quoting *American Motors*, 592 F.2d at 224.

We agree with the analysis of our appellate court and the Fourth Circuit in *American Motors*. GMC has not demonstrated any other effect beyond a restriction on intrabrand competition. Therefore, the Act does not place an excessive burden on interstate commerce, and we conclude that the it does not violate the commerce clause.

### V. Equal Protection and Special Legislation

GMC's final argument is that the Act violates the equal protection clause of both the Illinois Constitution of 1970 (Ill. Const. 1970, art.

I, §2), and the United States Constitution (U.S. Const., amend. XIV), as well as the special legislation clause of the Illinois Constitution (Ill. Const. 1970, art. IV, §13). GMC contends that there is no principled basis for giving protection to car dealership franchises but denying the same kind of protection to other types of franchises.

The special legislation clause prohibits the General Assembly from conferring a special benefit or privilege upon one person or group and excluding others that are similarly situated. *Schiller*, 221 Ill. 2d at 149. A special legislation challenge is generally judged by the same standards as an equal protection claim. *Crusius v. Illinois Gaming Board*, 216 Ill. 2d 315, 325 (2005). Moreover, in applying an equal protection analysis, we apply the same standard under both the United States Constitution and the Illinois Constitution. *Wauconda Fire Protection District v. Stonewall Orchards, LLP*, 214 Ill. 2d 417, 434 (2005).

A special legislation inquiry first involves the determination of whether the statute discriminates in favor of a select group. *Allen v. Woodfield Chevrolet, Inc.*, 208 Ill. 2d 12, 22 (2003). If it does, this court must then determine whether the classification created by the statute is arbitrary. *Allen*, 208 Ill. 2d at 22. Where the statute does not affect a fundamental right or involve a suspect classification, it will be judged under the deferential rational basis test, and the statute will be upheld if the legislative classification is rationally related to a legitimate state interest. *Crusius*, 216 Ill. 2d at 325. Thus, if this court can reasonably conceive of any set of facts that justify a distinction between the class the statute benefits and the class outside its scope, we will uphold the statute. *Crusius*, 216 Ill. 2d at 325. Again, we note that a statute carries a presumption of constitutionality and the party attacking it bears the burden of establishing its infirmity. *Schiller*, 221 Ill. 2d at 148.

Here, we find that the Franchise Act creates a legislative classification by treating existing automobile dealers differently than other kinds of franchise owners. However, the classification is related to the legitimate government purposes of redressing the disparity in bargaining power between automobile manufacturers and their existing dealers and of protecting the public from the negative impact of harmful franchise practices by automobile manufacturers. Additionally, the means employed by the statute–requiring a

determination by a neutral body that establishing a new dealership satisfies the "good cause" standard by taking into account considerations that are directly related to the purposes served by the statute–is rationally related to the legitimate purposes of the statute. Accordingly, we find that GMC has not met its burden of establishing that the statute is unconstitutionally infirm.

CONCLUSION

For the foregoing reasons, we affirm the judgment of the appellate court.

*Affirmed.*

JUSTICE KARMEIER, dissenting:

The majority opinion implicitly recognizes that the Act itself fails to provide a serviceable definition of "good cause" and "commercial reasonableness," and it casts about in search of one (see slip op. at 9-10), but a coherent and workable definition is never found or applied. The court touts a definition of "commercial reasonableness" it derives, not from a franchising context, but from a California case dealing with bulk sales and California's Uniform Commercial Code (slip op. at 10, citing *Gifford v. J. & A. Holdings*, 54 Cal. App. 4th 996, 63 Cal. Rptr. 2d 253 (1997)), defining "commercial reasonableness" as "commonly accepted commercial practices of responsible businesses which afford all parties fair treatment" (see slip op. at 10, quoting *Gifford*, 54 Cal. App. 4th at 1005-06, 63 Cal. Rptr. 2d at 259); however, I see no evidence that the court has utilized even that standard in its review of this matter.

Perhaps that is because the standard is so vague that it provides no meaningful guidance to either the parties whom it affects, the administrative body charged with implementing it, or courts which must review the administrative action. Perhaps it is because the definition has no real utility in the context of an Act whose sole purpose is to protect only *one* group: motor vehicle franchisees.

With respect to the first possibility, I would acknowledge that the legislature may delegate authority to an administrative body to

perform certain functions, however, in order to *properly* delegate such authority, the legislature must provide sufficient standards to guide the administrative body in the exercise of its functions. See *East St. Louis Federation of Teachers, Local 1220 v. East St. Louis School District No. 189 Financial Oversight Panel*, 178 Ill. 2d 399, 423 (1997). A law vesting discretionary power in an administrative body or officer must properly define the terms under which the discretion is to be exercised (*In re Application for Judgment & Sale of Delinquent Properties for the Tax Year 1989*, 167 Ill. 2d 161, 176 (1995)) and provide intelligible standards (*Hoogasian v. Regional Transportation Authority*, 58 Ill. 2d 117, 130 (1974)). Similarly, in order to provide adequate notice to those whom it affects, the statute must be explicit enough to serve as a guide to those who must comply with it. *Ardt v. Illinois Department of Professional Regulation*, 154 Ill. 2d 138, 157 (1992). A statute is considered unconstitutionally vague if its terms are so ill-defined that the ultimate decision as to its meaning rests on the opinions and whims of the trier of fact rather than any objective criteria or facts. *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 291 (2003). In my opinion, the Act does not satisfy the applicable criteria. Thus, I believe that the Act is an improper delegation of the legislature's authority *and* unconstitutionally vague. The majority's reliance upon the term "good cause" and the "11 circumstances" set forth in section 12(c) of the Act (815 ILCS 710/12(c) (West 2004)) does not persuade me otherwise. With the exception of subsections (5) and (8), those factors address only the interests of the protesting dealers, only one of the groups whose interests are at stake. As for subsections (5) and (8), they speak only of "the public welfare" and the "public interest," without providing any substantive guidance as to what those vague concepts mean, or even who is subsumed in "the public." This court has previously observed that "the Act does not state or identify what the overall or ultimate public interest is." *Fields Jeep-Eagle, Inc. v. Chrysler Corp.*, 163 Ill. 2d 462, 478 (1994). As far as I am aware, no legislative action has been taken since *Fields* to remedy that deficiency.

It is that deficiency which brings the discussion to the second possibility I previously mentioned. I believe the majority never again discusses its imported definition of "commercial reasonableness" because the majority at some level recognizes that the Act, and its "11

circumstances," display very little in the way of genuine concern for the interests of the manufacturer, its citizen-shareholders, or consumers generally, and it essentially provides no guidance as to how their interests might be identified and weighed.

The disingenuously benevolent language of the Act's "Declaration of purpose" (815 ILCS 710/1.1 (West 2004) (purporting to promote, *inter alia*, "the public interest and welfare" and that of "consumers generally")) rings hollow when the substantive provisions of the Act are applied. In practice, the Act benefits neither manufacturers–and the many citizens who have invested in them–nor consumers. This court has acknowledged as much:

> "The several statutory purposes and goals stated in this section are consistent with neither each other nor with various of the competing interests expressed in section 12(c). Protecting the private economic interests of dealers in their dealership investments and properties may, for example, militate against the allowance of an additional dealership and thereby frustrate the goal of protecting consumer interests by ensuring competition and convenience for consumers. Conversely, the allowance of an additional dealership which has the capability of offering lower prices and better service than an existing dealership may benefit consumers but result in a loss of business or even the entire investment of the existing dealer.
>
> *** [T]he Act does not state or identify what the overall or ultimate public interest is." *Fields Jeep-Eagle*, 163 Ill. 2d at 478.

The "standards" of the Act are inadequate to provide the guidance necessary to achieve the purported goals of section 1.1. Thus, the "assessment" of the administrative body becomes the "standard" itself. See slip op. at 8.

Beyond that deficiency, and notwithstanding its seemingly lofty purpose of protecting "the public interest and welfare" and "consumers generally," this Act is clearly nothing more than a protectionist measure favoring existing motor vehicle dealerships, and it should be acknowledged as such. In my opinion, there is no rational basis to justify a distinction between the class the statute benefits and

the class outside its scope. In short, it is special legislation. As Justice Cook noted in his insightful appellate court dissent: "Motor Vehicle Franchise Acts *** were justified on the basis of a 'disparity in bargaining power between automobile manufacturers and their dealers.' [*New Motor Vehicle Board v. Orrin W. Fox Co.*, 439 U.S. 96, 100, 58 L. Ed. 2d 361, 370, 99 S. Ct. 403, 407 (1978).]" 361 Ill. App. 3d at 293 (Cook, P.J., dissenting). As the Supreme Court noted in *New Motor*, at the time of that decision, " 'there exist[ed] only 5 passenger-car manufacturers, 3 of which produce[d] in excess of 95 percent of all passenger cars sold in the United States.' " *New Motor*, 439 U.S. at 100 n.4, 58 L. Ed. 2d at 370 n.4, 99 S. Ct. at 407 n.4, quoting S. Rep. No. 2073, 84th Cong., 2d Sess., 2 (1956). That is no longer the case. As Justice Cook observes:

> "We now live in a world of franchises. Motor vehicle dealers are given special treatment not enjoyed by other franchisees, who must protect themselves by the contracts they sign. Motor vehicle manufacturers from around the world now compete in the United States. New manufacturers can put dealers wherever they want them. Established manufacturers, such as General Motors, cannot." 361 Ill. App. 3d at 293 (Cook, P.J., dissenting).

Indeed, the contract is a well-known and time-honored device particularly suited to establishing the legal rights of parties *before* they enter into agreements and governing the nature and conditions of their relationship thereafter. If dealerships wish to limit the geographical proximity of other franchises, that would be a matter for negotiation *before* an agreement is concluded, when the parties' expectations are on the table. I fail to see how motor vehicle franchises differ in any significant respect from franchises for food service, home improvement or gas stations, just to name a few. All may have citizen investors who believe they stand to lose business and money when other franchises are granted in their area. Perhaps I am unaware of franchise laws protecting them; my belief is that they protect themselves through the contracts they sign.

As for any claimed disparity in bargaining power between automobile manufacturers and their dealers, I agree with Justice Cook's observation that the world has indeed changed since the Supreme Court's 1978 decision in *New Motor*, a development of

which GMC is no doubt well aware. Three manufacturers no longer dominate the American market, as automobile manufacturers struggle for market share, profitability, and in some instances survival. In such a business climate it seems implausible that a manufacturer would want to add dealerships that are not viable or purposefully risk disruption in the chain of distribution by undermining its existing dealerships. I simply fail to see how motor vehicle franchisees are in a less favorable position, vis-á-vis their franchisers, than other franchisees are with respect to theirs. The majority's one-paragraph rejection of GMC's special legislation argument offers no explanation.

Because I believe the majority opinion offers no meaningful standard of review, and because I believe the Motor Vehicle Franchise Act is unconstitutional, I respectfully dissent.