# Illinois Official Reports

## Appellate Court

---

**Nissan North America, Inc. v. Motor Vehicle Review Board,**
**2014 IL App (1st) 123795**

---

| | |
|---|---|
| Appellate Court Caption | NISSAN NORTH AMERICA, INC., Along With Its Infiniti Division, Plaintiff-Appellant, v. THE MOTOR VEHICLE REVIEW BOARD; TERRENCE M. O'BRIEN, Chairperson of the Motor Vehicle Review Board; M.E. FIELDS, INC., d/b/a Fields Infiniti; and YAMPA VALLEY ENTERPRISES, INC., d/b/a Fields Infiniti of Lake County, Defendants-Appellees. |
| District & No. | First District, Fourth Division<br>Docket No. 1-12-3795 |
| Filed | February 20, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The "Warranty Supplemental Cost Recovery" charge plaintiff automobile manufacturer attempted to impose on its dealers in order to recover the cost of the labor and parts its Illinois dealers provided in satisfying the manufacturer's warranties was properly found to violate section 6 of the Motor Vehicle Franchise Act and could not stand, since the Act required plaintiff to comply with certain conditions in order to recover the costs of the dealers' warranty work, but plaintiff ignored the Act's conditions when it reimbursed its dealers for their warranty costs and then recouped those costs through the "Warranty Supplemental Cost Recovery" program. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CH-10167; the Hon. Mary L. Mikva, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Kenneth S. GoodSmith and D.R. Edwards, both of GoodSmith Gregg & Unruh LLP, of Chicago, and Daniel L. Goldberg, James C. McGrath, and Christina Chan, all of Bingham McCutchen LLP, of Boston, Massachusetts, for appellant.

Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Ann C. Maskaleris, Assistant Attorney General, of counsel), for appellee Motor Vehicle Review Board.

Ira M. Levin and Eric P. VanderPloeg, both of Burke, Warren, MacKay & Serritella, P.C., of Chicago, for appellees M.E. Fields, Inc., and Yampa Valley Enterprises, Inc.

Kathryn Long, of Hogan Lovells US LLP, of Washington, D.C., and John J. Sullivan and Carl J. Chiappa, both of Hogan Lovells US LLP, of New York, New York, for *amicus curiae* Alliance of Automobile Manufacturers.

Lawrence R. Doll, of Illinois Automobile Dealers Association, of Springfield, and Dennis M. O'Keefe, of Chicago Automobile Trade Association, of Lake Forest, for *amicus curiae*.

Panel

JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.
Presiding Justice Howse and Justice Lavin concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendants-appellees M.E. Fields, Inc., d/b/a Fields Infiniti (Fields), and Yampa Valley Enterprises, Inc., d/b/a Fields Infiniti of Lake County (Yampa), filed protests with defendant-appellee the Motor Vehicle Review Board (Board) against plaintiff-appellant Nissan North America, Inc., along with its Infiniti Division (Nissan), with respect to a "Warranty Supplemental Cost Recovery" charge Nissan was imposing on all of its new Infiniti vehicles purchased by Infiniti dealers in Illinois. Fields and Yampa asserted that this charge violated section 6 of the Motor Vehicle Franchise Act (Act) (815 ILCS 710/6 (West 2012)). Following a hearing, the Board agreed with Fields and Yampa. Nissan sought administrative review of the decision, and the trial court upheld the Board's order. Nissan appeals, contending

that the Board's order is inconsistent with the plain language of the Act, that the trial court's interpretation of section 6 was erroneous, that a portion of section 6 has been impermissibly applied retroactively, and that the Board's interpretation of section 6 is unconstitutional. Nissan asks that we reverse the Board's order with instructions that judgment be entered in its favor.[1] For the following reasons, we affirm.

¶ 2                                    BACKGROUND

¶ 3        The crux of this appeal centers around section 6 of the Act, so we begin by laying out those portions relevant to the instant cause. Section 6, as a whole, pertains to automotive warranty agreements and warranty repairs, and attempts to strike a balance regarding the issue of reimbursement as between manufacturers that sponsor these agreements and their dealers that are required to complete the repairs. Currently, and for purposes of the instant cause, section 6(a) directs that a manufacturer "shall properly fulfill any warranty agreement and adequately and fairly compensate each of its motor vehicle dealers for labor and parts." 815 ILCS 710/6(a) (West 2012). In relation, section 6(b) discusses what is "adequate" and "fair" compensation, and states, in relevant part:

> "In no event shall such compensation fail to include reasonable compensation for diagnostic work, as well as repair service, labor, and parts. *** The franchiser shall reimburse the franchisee for any parts provided in satisfaction of a warranty at the prevailing retail price charged by that dealer for the same parts when not provided in satisfaction of a warranty; provided that such motor vehicle franchisee's prevailing retail price is not unreasonable when compared with that of the holders of motor vehicle franchises from the same motor vehicle franchiser for identical merchandise in the geographic area in which the motor vehicle franchisee is engaged in business." 815 ILCS 710/6(b) (West 2012).

Subsequent subsections of section 6 define how the "prevailing retail price" is calculated, what parts are covered, and who qualifies as a franchiser. See 815 ILCS 710/6(d), (e), (f) (West 2012).

¶ 4        Also significant to the instant cause is subsection (g), which the legislature added to section 6 in 2001. See Pub. Act 92-498 (eff. Dec. 12, 2001) (adding 815 ILCS 710/6(g)). That subsection permits a manufacturer and a majority of its dealers to agree to a uniform warranty reimbursement policy that would allow the manufacturer to pay those dealers entering into the written agreement a price less than the dealers' prevailing retail price for parts used in warranty repairs as specified in subsection (b). Section 6(g)(1) states, in relevant part:

> "Any motor vehicle franchiser and at least a majority of its Illinois franchisees of the same line make may agree in an express written contract citing this Section upon a uniform warranty reimbursement policy used by contracting franchisees to perform warranty repairs. *** Reimbursement for parts under the agreement shall be used

_____

[1]We note for the record that other organizations that are not parties to this appeal were granted leave and have filed briefs in this cause. For example, in addition to the Board (which filed its own separate brief in support of its decision below), the Alliance of Automobile Manufacturers filed an *amicus curiae* brief in support of Nissan, while the Illinois Automobile Dealers Association and the Chicago Automobile Trade Association filed an *amici curiae* brief in support of Fields and Yampa.

instead of the franchisees' 'prevailing retail price charged by that dealer for the same parts' as defined in this Section to calculate compensation due from the franchiser for parts used in warranty repairs." 815 ILCS 710/6(g)(1) (West 2012).[2]

Section 6(g)(2) then describes that, if such an express written contract between the manufacturer and a majority of its dealers exists, the manufacturer may recover its costs from the remaining, minority dealers who did not join in the written agreement but who continue to receive their prevailing retail price for parts used in warranty repairs pursuant to subsection (b):

"A franchiser that enters into an agreement with its franchisees pursuant to paragraph (1) of this subsection (g) may seek to recover its costs from only those franchisees that are receiving their 'prevailing retail price charged by that dealer' under subsections (a) through (f) of this Section ***[.]" 815 ILCS 710/6(g)(2) (West 2012).[3]

And, in the event that a manufacturer and a majority of its dealers do not enter into an agreement as described concerning warranty reimbursement, section 6(g)(4) states:

"If a franchiser and its franchisees do not enter into an agreement pursuant to paragraph (1) of this subsection (g), and for any matter that is not the subject of an agreement, this subsection (g) shall have no effect whatsoever." 815 ILCS 710/6(g)(4) (West 2012).

Having laid out the applicable statute, we now turn to the pertinent facts of the instant cause.

¶ 5        Nissan is the manufacturer and distributor/franchiser of Infiniti-brand vehicles and does business here in Illinois. Nissan sells Infiniti vehicles to its dealers at a wholesale price, and then each dealer determines the retail sales price of the vehicles to charge consumers. Pursuant to its standard Infiniti "Dealer Sales and Service Agreement" (Dealer Agreement), Nissan is allowed to set and, at any time prior to shipment to its dealers, change the price, discount, allowance or any other term of sale of any Infiniti vehicle without prior notice or liability to its dealers. In addition, with each purchase, Nissan issues new vehicle warranties to consumers warranting that its vehicles will be free from defect and damage for a certain period of time or for a certain number of miles. Again, pursuant to its standard Dealer Agreement, dealers are to perform any warranty repairs on qualifying Infiniti vehicles under the new vehicle warranty issued by Nissan. A dealer must do so no matter if the customer purchased the vehicle from that or any other Infiniti dealer, and dealers must use Infiniti parts and accessories in these warranty repairs. Also, dealers cannot charge consumers for these parts and accessories, nor

---

[2]The agreement must establish a uniform parts reimbursement rate, apply to all warranty repair orders during the effective period of the agreement, be available to any franchisee of the same line make and be for a term not to exceed three years. See 815 ILCS 710/6(g)(1) (West 2012).

[3]"[C]osts" is defined as the difference between the rate set forth in the agreement and the " 'prevailing retail price charged by that dealer' " received by the minority franchisees; the costs can only be recovered by increasing the invoice price of new vehicles; while the price increases may vary, they shall apply uniformly to all minority franchisees. See 815 ILCS 710/6(g)(2)(A) (West 2012).

We further note that section 6(g)(3) prescribes duties upon the manufacturer with respect to the agreement reached with the majority of its dealers, including that it certify its existence to the Board, maintain files with respect to it and make certain annual reportings concerning it to the Board. 815 ILCS 710/6(g)(3) (West 2012).

for any labor expended by the dealers during the repair. In turn, Nissan agrees to reimburse the dealers for the parts and labor used in these warranty repairs. There is no provision in the Dealer Agreement specifically authorizing Nissan to recoup or recover any costs from the dealers that Nissan expends pursuant to its reimbursement to the dealers for parts and labor used in warranty repairs.

¶ 6    Fields became an Infiniti dealer in 1991 when it and Nissan entered into a Dealer Agreement containing the provisions just outlined. Likewise, Yampa became an Infiniti dealer in 1994 when it, too, signed the same standard Dealer Agreement. Fields' and Yampa's respective Dealer Agreements have been amended several times since their original creation. For example, Fields' Dealer Agreement was amended in 2005 with respect to provisions concerning management of the dealership, trade dress, dispute resolution and exclusivity. And, in 2004, Nissan amended provisions concerning Yampa's primary market area that had been established in its original Dealer Agreement.

¶ 7    The parties stipulate, and the record is clear, that Nissan does not have a written agreement with a majority of its Illinois Infiniti dealers setting a uniform reimbursement rate for parts or labor used in warranty repairs pursuant to section 6(g)(1) of the Act. Instead, Nissan pays its dealers their prevailing retail prices, as outlined in section 6(b), for parts and labor they expend during their warranty repairs.

¶ 8     In 2007, without notice to its dealers, and in an effort to offset the increased costs of doing business in Illinois with respect to warranty repairs for which, again, Nissan had not established a written agreement with a majority of its dealers setting a uniform parts reimbursement rate, Nissan began imposing an across-the-board surcharge on the wholesale invoice of each new vehicle it was selling to its dealers. Nissan listed the surcharge as a "Warranty Supplemental Cost Recovery" charge; it ranged from as low as $90 at one time to as high as $245 by 2009. The surcharge appeared as a separate line-item charge to the dealers as part of their total costs owed to Nissan via the wholesale invoice, but did not appear as a charge that figured into the total manufacturer's suggested retail price (MSRP) of the vehicle on the invoice as did other line-item charges such as destination and handling costs and vehicle options like splash guards, navigation systems, trunk mats, et cetera. Nissan imposed the charge on all new Infiniti vehicles sold to all Illinois dealers, regardless of their actual individual warranty reimbursements.

¶ 9    Upon imposition of the Warranty Supplemental Cost Recovery surcharge, Fields and Yampa demanded that Nissan remove it from the total cost it charged its dealers for new Infiniti vehicles. Nissan refused, and Fields and Yampa filed protests with the Board, asserting that this surcharge violated section 6 of the Act. Fields and Yampa argued that section 6(g) provided the only method by which Nissan could recover costs relating to reimbursing its Illinois dealers for parts and labor used in warranty repairs and, since there was no written agreement for a uniform warranty reimbursement policy between Nissan and a majority of its dealers as required under section 6(g)(1), the warranty surcharge violated the statute. Nissan, meanwhile, disagreed with Fields' and Yampa's interpretation of section 6(g). Nissan admitted it did not have a written agreement with a majority of its dealers, but argued that the warranty surcharge did not violate section 6 because section 6(g)(4) stated that section 6(g) "shall have no effect whatsoever" if no such agreement existed. Thus, Nissan reasoned that, because no other provision in section 6 prohibited it from recovering warranty costs, the warranty

surcharge did not violate the Act. In response, Fields and Yampa disputed Nissan's interpretation of subsection (g), arguing that without an agreement under that section, as was the case here, then section 6(b), standing alone, governed the situation.

¶ 10 The Board held a hearing, and its hearing officer issued a proposed decision granting Fields' and Yampa's protests. In its proposed decision, the hearing officer concluded that, "although [Nissan] has a right to set the wholesale price of the vehicles it sells to its dealers, [its] practice of charging its dealers in Illinois a Warranty Supplemental Cost Recovery charge on each wholesale invoice violates the spirit and principle of Section 6," which was enacted to protect dealers. The hearing officer noted Nissan's claim that it abides by section 6 in that it reimburses its dealers the full retail rate when it comes to warranty repairs, and that the Supplemental Warranty Cost Recovery surcharge is a separate charge that is applied to all dealers equally regardless of an individual dealer's warranty reimbursements. However, the hearing officer found this to be "semantics," since there was "no dispute that the charge relates to the very same issue–[Nissan's] costs of reimbursing its dealers for parts used in warranty repairs." He reasoned that, by imposing this surcharge, Nissan was effectively reducing the amount that it was reimbursing its dealers on parts used for warranty repairs without any written agreement with a majority of its dealers otherwise in place, in direct violation of section 6. In particular, the hearing officer cited his rejection of Nissan's interpretation of section 6(g), noting that "this section, which provides a mechanism whereby a manufacturer can reach an agreement with the majority of its Illinois dealers to reimburse dealers for parts used in warranty repairs at a lower 'uniform reimbursement rate' (versus the higher retail rate or MSRP), was made a part of Section 6 for a reason and other manufacturers have utilized it." Accordingly, and after finding it inappropriate to consider any constitutional challenges raised by Nissan, the hearing officer recommended to the Board that it uphold Fields' and Yampa's protests and declare that Nissan's Warranty Supplemental Cost Recovery surcharge violated section 6 of the Act.

¶ 11 Upon review of the proposed decision and the record in the cause, the Board issued a final order adopting the hearing officer's proposed decision as its own.

¶ 12 Nissan then filed a complaint for administrative review, whereupon the trial court upheld the Board's final administrative decision. In its order, the trial court set out the pertinent provisions of section 6, namely, subsections (b) and (g), and noted that the parties' arguments turned on their statutory construction and interpretation. The court concluded that section 6(g) could not be ignored, as Nissan proposed, but is, instead, of critical importance, as it "provides a specific mechanism for manufacturers to limit and pass on to dealers the costs of compliance with section 6(b)," a mechanism that Nissan chose not to employ. The court reasoned that, as such, section 6(g) "serves only to clarify" section 6(b), which was the section "actually being violated" by Nissan here, and prohibits manufacturers like Nissan from recouping the costs of compliance with the Act without utilizing the procedures set forth in section 6(g). The court then debunked Nissan's reliance on the language of section 6(g)(4), finding that it does not mean that the section does not apply but, rather, that a cost recovery mechanism and formula, as provided by section 6, is to be utilized only where the manufacturer and the dealers have come to an agreement to do so. In addition, the court found no validity in either Nissan's retroactivity argument or its constitutional claims as argued below. Accordingly, the court affirmed the Board's decision finding Nissan's Warranty Supplemental Cost Recovery

surcharge to be in violation of section 6 of the Act.

¶ 13                                      ANALYSIS

¶ 14     As noted, Nissan asserts several contentions on appeal, attacking the Board's and the trial court's interpretation of section 6 and its application as impermissibly retroactive and unconstitutional.

¶ 15     The parties concede, and we agree, that the standard of review applicable to this cause is *de novo*. Clearly, we are called to examine whether Nissan's imposition of the Warranty Supplemental Cost Recovery surcharge violates section 6 of the Act; this is a question of law. See *Carpetland U.S.A., Inc. v. Illinois Department of Employment Security*, 201 Ill. 2d 351, 369 (2002) (questions that are comprised purely of law are reviewed *de novo*); accord *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 390 (2001). In addition, we review questions involving retroactivity and constitutionality *de novo*. See *Lazenby v. Mark's Construction, Inc.*, 236 Ill. 2d 83, 93 (2010) (constitutional challenges to statutes are reviewed *de novo*); *Deicke Center-Marklund Children's Home v. Illinois Health Facilities Planning Board*, 389 Ill. App. 3d 300, 303 (2009) (question of retroactivity is a matter of statutory construction, which is reviewed *de novo*).

¶ 16     We, as the reviewing court in the administrative setting, review the Board's decision, not that of the trial court. See *Wolin v. Department of Financial & Professional Regulation*, 2012 IL App (1st) 112113, ¶ 19. While our review is to be *de novo*, the Board's decision does merit some deference on questions of statutory interpretation, since it is this agency that is in charge of administering the provisions of the Act. See 815 ILCS 710/18 (West 2012) (Board is tasked with administering the Act); see also *General Motors Corp. v. State of Illinois Motor Vehicle Review Board*, 224 Ill. 2d 1, 17 (2007) (reviewing court is not bound by agency's interpretation of statute, but its review of the administrative decision in this respect is "significantly deferential to an agency's experience in construing and applying the statutes that it administers"); accord *Swoope v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 323 Ill. App. 3d 526, 529 (2001) ("agency is presumed to make informed judgments based on its experience and expertise" in applying act it administers "and, thus, substantial deference is given to its interpretation of a statute"). And, in instances where statutory ambiguities must be resolved or there is reasonable debate about a statute's meaning, the Board's determination is wholly relevant. See *General Motors*, 224 Ill. 2d at 13 (while Board's interpretation of Act's provisions is not binding on reviewing court, it "will be given deference" where there is reasonable debate); accord *Comprehensive Community Solutions, Inc. v. Rockford School District No. 205*, 216 Ill. 2d 455, 471 (2005).

¶ 17     In addition to these rules regarding administrative review, the parties also agree with the basic principles regarding statutory interpretation which, again, is the main focus of this cause. All statutes are presumed to be constitutional, and it is the burden of the party challenging the statute at issue to demonstrate that it is not. See *City of Chicago v. Pooh Bah Enterprises, Inc.*, 224 Ill. 2d 390, 406 (2006). Our objective in this context, as the reviewing court, is to ascertain and give effect to the legislature's intent in enacting the statute, and the best evidence of this is the statute's very language. See *Maddux v. Blagojevich*, 233 Ill. 2d 508, 513 (2009); *J.S.A. v. M.H.*, 224 Ill. 2d 182, 196-97 (2007). Thus, a statute should be construed and applied as written. See *Maddux*, 233 Ill. 2d at 513; accord *County of Knox v. The Highlands, L.L.C.*, 188

- 7 -

Ill. 2d 546, 556 (1999); see also *Quad Cities Open, Inc. v. City of Silvis*, 208 Ill. 2d 498, 508 (2004). We are to interpret the words and phrases of the statute in relation to the entire act at issue, and no word or provision is to be rendered meaningless due to our interpretation. See *Cassens Transport Co. v. Industrial Comm'n*, 218 Ill. 2d 519, 524 (2006) (each word, clause and sentence is to be given a reasonable meaning so as not to render any portion of statute meaningless or void); *Garden View, LLC v. Fletcher*, 394 Ill. App. 3d 577, 583 (2009) (act is to be read as whole and in light of all relevant provisions so that section at issue is not construed in isolation). Nor are we to read any extra language, exceptions, limitations or conditions into the statute that are not already present. See *Maddux*, 233 Ill. 2d at 517. Ultimately, the statute's plain language, and that language's ordinary meaning, controls its interpretation. See *Maddux*, 233 Ill. 2d at 513.

¶ 18 Nissan rests its interpretation of section 6 on its argument that its Warranty Supplemental Cost Recovery surcharge is not prohibited by the plain language of the statute. First, Nissan notes that there is no express language in section 6(b) that bars this charge. As such, Nissan insists that its Dealer Agreement, and the provision contained therein giving it the right to set the wholesale price of its vehicles, controls; and, that, because it otherwise reimburses its dealers at the prevailing retail price charged by them for parts and labor for warranty repairs in accord with section 6(b), it does not commit any violation of that section by also imposing this completely unrelated surcharge. Second, Nissan argues that section 6(g) cannot be considered here because it was enacted in 2001, well after Nissan entered into the Dealer Agreements with Fields and Yampa, thereby rendering any application of that section impermissibly retroactive. And, finally, Nissan claims that, even if section 6(g) applies, subsection (g)(4) makes clear that it has "no effect whatsoever" in light of the present circumstances. See 815 ILCS 710/6(g)(4) (West 2012). In support of these arguments, Nissan relies heavily on two federal cases: *Acadia Motors, Inc. v. Ford Motor Co.*, 44 F.3d 1050 (1st Cir. 1995), and *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 676 F.3d 318 (3d Cir. 2012).

¶ 19 However, not only is Nissan's interpretation of section 6 completely against that statute's plain meaning and intended application, but we find that none of its arguments has any merit in light of the circumstances of this cause and that its reliance on *Acadia* and *Liberty* is wholly misplaced.

¶ 20 We begin with our review of the proper interpretation of section 6. The purpose of that section, as it clearly states, is to mandate that a manufacturer, like Nissan, compensate its dealers, like Fields and Yampa, for labor and parts they expend during repairs made pursuant to warranty agreements the manufacturer sponsors. See 815 ILCS 710/6(a) (West 2012). Undoubtedly, this is the goal of the statute–to reimburse dealers that are constrained to follow warranty agreements issued by the manufacturer. Section 6(b) describes the "adequate" and "fair" method for this, namely, that the manufacturer is to pay its dealers the prevailing retail price they charge for the same parts when not provided in satisfaction of a warranty. See 815 ILCS 710/6(b) (West 2012).

¶ 21 Nissan is technically correct that section 6(b), itself, does not contain express language prohibiting any sort of extra, separate charge upon dealers as a method of cost recovery. However, at the same time, it does not contain any language permitting such a charge, either. Yet, what is more significant here is that Nissan's interpretation of section 6(b) ignores the express language of section 6(g), which, when read in conjunction with section 6(b) as is

- 8 -

required pursuant to our rules on statutory interpretation, makes clear that Nissan's surcharge does, in fact, violate the statute.

¶ 22    After section 6(b)'s directive to the manufacturer to reimburse its dealers for the parts and labor they expend during warranty repairs at the dealers' prevailing retail price, section 6(g) permits a manufacturer to reimburse them at a lesser price. However, there are conditions to this. In order to pay a price less than that prescribed in section 6(b), the manufacturer must first obtain a written agreement with a majority of its dealers for a uniform warranty reimbursement policy setting the price. See 815 ILCS 710/6(g)(1) (West 2012). Then, once the contract is in place, the manufacturer can pay the lesser reimbursement price to its majority, agreeing, dealers while, in turn, recovering its costs from the remaining, minority dealers that did not join in the written agreement but that continue to receive their prevailing retail price for parts used in warranty repairs pursuant to subsection (b). See 815 ILCS 710/6(g)(1), (2) (West 2012).

¶ 23    Therefore, when read together, section 6(g) acts as a clarification of section 6(b), which, admittedly, is silent on the issue of cost recovery. Section 6(b) mandates reimbursement to the dealers and sets this reimbursement at the dealers' prevailing retail price for labor and parts. Section 6(g), meanwhile, provides a specific mechanism for the manufacturer to limit the cost of complying with section 6(b). That is, to avoid paying the "prevailing retail price" and, instead, to reimburse its dealers at a lesser rate, the manufacturer must obtain written agreements to do so with a majority of these dealers. Then, and only then, can it pay this lesser rate and, in turn, recover its costs from (only) those dealers that did not agree with the majority and are still charging their prevailing retail price as described in section 6(b). Accordingly, it is of no significance that section 6(b) remains silent with respect to cost recovery because it is section 6(g) that provides the one, and only, exception for a manufacturer to recoup its costs.

¶ 24    To interpret this statute the way Nissan would have us would require us to stop reading section 6 after subsection (b) and to ignore subsection (g) in its entirety, thereby rendering it meaningless. To the contrary, as we have just shown, these two subsections work in tandem. Subsection (b) does not expressly bar cost recovery. However, subsection (g) *does* place conditions on it, which, principle among them, include the manufacturer's procurement of a written agreement with the majority of its dealers and the imposition of any cost recovery upon only those minority dealers that refuse to participate in the agreement.

¶ 25    The record is clear, and Nissan has admitted, that it does not have a written agreement in place with the majority of its dealers, as required by section 6(g). And, it has admitted that its Warranty Supplemental Cost Recovery surcharge is a charge that is "across-the-board," is applied to all Infiniti vehicles sold to all of its dealers regardless of their actual warranty repair costs, and was imposed in an effort to recoup its costs of reimbursing its dealers under section 6. In imposing this charge, Nissan chose not to follow the conditions and requirements set forth in subsection (g) to obtain warranty cost recovery from its dealers it otherwise could have under the Act. This it cannot do, in light of the plain language of section 6.

¶ 26    Nissan's arguments to the contrary fail, in several respects. First, Nissan cites its standard Dealer Agreement and concludes that, because this contract gives it the right to set the wholesale price of its vehicles and because it otherwise reimburses its dealers in accordance with section 6(b), it does not commit any violation of the statute by also imposing the unrelated Warranty Supplemental Cost Recovery surcharge. Again, however, such reasoning would

require ignoring section 6(g) in its entirety. While there is no cost recovery bar expressed in section 6(b), we have already shown that section 6(g) provides the one, and only, method for a manufacturer to recoup its warranty costs: it can only do so if it first has a written agreement with a majority of its dealers, and then, it can only recover such costs from the remaining minority dealers who choose not to participate. Without such an agreement, the manufacturer is stuck fulfilling its duty of paying its dealers their prevailing retail price as mandated in section 6(b), without exception.

¶ 27     Moreover, that Nissan's standard Dealer Agreement gives it the right to set the price of its vehicles is irrelevant here. Indeed, Nissan has this right and its dealers, including Fields and Yampa, have agreed to it by signing the Dealer Agreement. However, Nissan's right is limited to just that: setting the wholesale price of the vehicles it sells to its dealers. There is no provision in the Dealer Agreement that allows Nissan to recover its warranty costs. And, the Warranty Supplemental Cost Recovery charge, itself, is not an adjustment to the wholesale price of its vehicles. To the contrary, the record shows that it is a separate, "supplemental," charge that has nothing to do with the wholesale price. Instead, it is a distinct line-item charge that is not even included in the MSRP of the vehicles (as other charges are), and it is an extra charge that is imposed only upon the dealers themselves. And, by its very name and description, it is not a charge unrelated to the warranty reimbursement mandate of section 6(b). Rather, it is inexorably tied to that very cost–supplementary recoupment of Nissan's reimbursement to its dealers for the labor and parts they expend during warranty repairs. Nissan has called the warranty reimbursement mandate of section 6(b) a "cost of doing business in Illinois," which it is trying to offset by imposing upon its dealers what is, essentially, the same charge it must pay them under that section. Nissan is trying to insert a loophole in the law that section 6(g) prevents, rendering its warranty surcharge a clear violation of section 6(b).

¶ 28     Nissan's next argument in support of its imposition of the surcharge is that section 6(g) cannot be considered in the instant cause because it was enacted in 2001, long after it entered into the Dealer Agreements with Fields and Yampa which set out the parties' rights. Thus, it concludes, any application of section 6(g) would be impermissibly retroactive. This argument, too, fails on multiple levels. The application of a statute is impermissibly retroactive if the legislature expressly prescribes its reach to actions that have taken place prior to its enactment, or if its application would impair the rights a party possessed when it acted, would increase a party's liability for past conduct, or would impose new duties with respect to actions already taken. See *Caveney v. Bower*, 207 Ill. 2d 82, 91 (2003). Thus, if its application would impact a party's vested rights, the statute should not be applied. See *Caveney*, 207 Ill. 2d at 94-95; accord *Northwest Lincoln-Mercury v. Lincoln-Mercury Division Ford Motor Co.*, 158 Ill. App. 3d 609, 612 (1987) (citing *Fireside Chrysler-Plymouth Mazda, Inc. v. Chrysler Corp.*, 129 Ill. App. 3d 575 (1984), and stating that merely because the parties to a dispute under the Act have a preexisting franchise agreement does not automatically prohibit the application of an amendment to the Act after the agreement was made).

¶ 29     In the instant cause, there is no express legislative prescription with respect to retroactivity and section 6. Moreover, we have just concluded that Nissan does not have, nor has it ever had, a vested right to impose the Warranty Supplemental Cost Recovery surcharge. Again, the Dealer Agreement that Fields signed in 1991 and Yampa signed in 1994 did not expressly give

Nissan the right to apply a surcharge to compensate for the cost of complying with section 6(b). It gave Nissan the right to set the wholesale price of its vehicles to sell to dealers, but there was no contractual right to also charge them the extra cost at issue. And, in a practical sense, Nissan did not even begin assessing this charge until 2007–long after both the Dealer Agreement was signed by Fields and Yampa and section 6(g) was enacted. See *Fireside Chrysler*, 129 Ill. App. 3d at 582 (a "vested right is more than a mere expectation based upon an anticipated continuance of existing law; it must have become a fixed right, complete and consummated"). Ultimately, as Nissan had no vested right that became displaced at the time section 6(g) was enacted, retroactive application of that section is, contrary to Nissan's insistence, not improper. See also *Fireside Chrysler*, 129 Ill. App. 3d at 583 (existing dealership agreement between parties does not mean that subsequent action by one party cannot be in violation of a new provision of the Act).[4]

¶ 30    Finally, Nissan argues that, even if section 6(g) does apply to the instant cause, subsection (g)(4) indicates that it has no effect on the instant cause. Nissan hinges its reasoning on the isolation of the language of that subsection, which states that if a manufacturer does not enter into an agreement with a majority of its dealers concerning warranty reimbursement pursuant to section 6(g)(1), "this subsection (g) shall have no effect whatsoever." 815 ILCS 710/6(g)(4) (West 2012). From this, Nissan argues that nothing in section 6(g) or 6(b) prohibits it from coming up with its own method of warranty reimbursement if it chooses not to enter into an agreement with its dealers. However, this is not what section 6(g) says or means, by any stretch of the imagination. Rather, section 6(g)(4) clarifies that the only cost recovery method allowed by section 6, as found in subsection (g), can be used only where the manufacturer and a majority of its dealers have come to an agreement to do so. That is, if, and when, such an agreement is reached, the manufacturer may then proceed to recover costs against its minority dealers. But, if, and when, such an agreement is not reached, the one and only opportunity for cost recovery, as found in section 6(g), is lost and cannot be used by the manufacturer. Rather, that opportunity presented in section 6(g) "shall have no effect whatsoever" on the relationship between the manufacturer and its dealers. To interpret section 6(g)(4) as Nissan would have us would render section 6(g) of the Act, and the conditions it prescribes, utterly meaningless.

¶ 31    Just as Nissan's arguments are misplaced, so too is its reliance on *Acadia* and *Liberty*. Nissan is correct that both of these cases involve statutes similar to section 6(b) of the Act at issue herein, and that the courts in both these cases upheld warranty surcharges imposed by manufacturers upon their dealers. However, this is where the similarities end, as these federal cases are wholly distinguishable from the instant cause and, accordingly, do not support Nissan's position here.

¶ 32    For example, in *Acadia*, a Maine statute required manufacturer Ford, which offered warranties on all its new vehicles, to reimburse its dealers for parts and labor at the retail rate charged for the same parts and labor when not provided under a warranty repair. See *Acadia*, 44 F.3d at 1052. When the legislature increased the dealer reimbursement rate, Ford began to impose a surcharge on each new vehicle it sold to them, which it called a "warranty parity

---

[4]Even if Nissan had such a vested right under its Dealer Agreement (which it does not), we explained at length earlier that the Act does not bar warranty cost recovery; it merely prescribes the method a manufacturer must follow in order to recoup its costs.

- 11 -

surcharge." *Acadia*, 44 F.3d at 1052-53. The dealers brought suit to stop this practice, arguing that allowing Ford to assess this charge against them was tantamount to effectively negating the reimbursement they were supposed to receive under the statute. See *Acadia*, 44 F.3d at 1053. The First Circuit Court of Appeals disagreed with the dealers and upheld the propriety of Ford's surcharge. In doing so, the *Acadia* court focused on the fact that there was nothing in the Maine statute prohibiting a manufacturer from increasing its prices in order to recover its costs of complying with the statute's warranty reimbursement provision. See *Acadia*, 44 F.3d at 1056. The *Acadia* court closely examined the language of the Maine act and concluded, significantly, that, not only did it "contain[ ] no language restricting cost recovery, it also contain[ed] no language *conditioning* cost recovery." (Emphasis in original.) *Acadia*, 44 F.3d at 1056. Instead, without any such provision, the act "simply and soley" regulated the rates at which a manufacturer must reimburse its dealers for warranty parts and labor and, since there was nothing else speaking to warranty reimbursement, there was no indication that the Maine legislature intended to either "prohibit or condition" a manufacturer's ability to recover its costs. See *Acadia*, 44 F.3d at 1057. Accordingly, Ford's imposition of its warranty surcharge to recoup its added costs of complying with the statute requiring reimbursement to its dealers for warranty parts and labor was permissible. See *Acadia*, 44 F.3d at 1056.

¶ 33　　Likewise, in *Liberty*, a New Jersey statute required manufacturer Ford to reimburse its dealers for parts used in warranty repairs at the dealers' prevailing retail price, which was higher than what Ford had originally been reimbursing them under their standard nationwide dealer agreements. *Liberty*, 676 F.3d at 321-22. When the dealers asked Ford to abide by the statute, Ford agreed but then informed them that it would be imposing a "New Jersey Cost Surcharge" to recover it increased costs of complying with the statute. *Liberty*, 676 F.3d at 322. This charge was a flat surcharge on every wholesale vehicle sold in the state which, effectively, increased in proportion to the number of vehicles a dealer purchased. *Liberty*, 676 F.3d at 322. The dealers filed suit, claiming that this surcharge violated the statute's mandate that Ford reimburse them for warranty parts at their prevailing retail price. The Third Circuit Court of Appeals disagreed and upheld Ford's cost recovery surcharge. Relying heavily on *Acadia*, the *Liberty* court similarly noted that, while the New Jersey statute regulated warranty reimbursements, it did not impose any limitation on wholesale price increases as a means a manufacturer could use to recoup its costs of complying with the statute. *Liberty*, 676 F.3d at 324-25. There simply was no language prohibiting this, nor was there any language limiting or conditioning such cost recovery schemes. *Liberty*, 676 F.3d at 325.

¶ 34　　We have no dispute with the holdings of *Acadia* and *Liberty*. Under the circumstances presented therein, those cases were decided properly–where a statute does not prohibit or limit cost recovery for warranty reimbursement, then a manufacturer has every right to impose a surcharge in order to recoup the costs it must pay its dealers under the mandates of that statute. See, *e.g.*, *Liberty*, 676 F.3d at 325; *Acadia*, 44 F.3d at 1056. However, this is not the scenario presented in the cause before us involving Nissan and its dealers here in Illinois. Not only are *Acadia* and *Liberty* distinguishable because they are federal cases that do not involve the Illinois law, but there is also a significant, and critical, difference. In direct contrast to the Maine and New Jersey statutes, the Act at issue here provides a specific method for a manufacturer to recover its costs of compliance with section 6(b)'s mandate of compensating dealers for warranty repairs, and that is the Act's specific and express inclusion of section 6(g).

Again, this section permits a manufacturer that wants to pay a lower reimbursement rate to its dealers than that mandated in section 6(b), namely, the dealers' prevailing retail price, to enter into an agreement for a lesser, uniform reimbursement rate with the majority of its Illinois dealers. See 815 ILCS 710/6(b), (g)(1) (West 2012). When such an agreement has been reached, the manufacturer can then pass on its compliance costs to its minority Illinois dealers that did not agree to the uniform rate. See 815 ILCS 710/6(g)(2) (West 2012). Thus, while, like the Maine and New Jersey statutes of *Acadia* and *Liberty*, the Act does not bar warranty cost recovery, it does, in drastic contradistinction to those acts, limit and condition cost recovery on a manufacturer's compliance with section 6(g).[5] Accordingly, since Nissan has admittedly chosen to ignore section 6(g)'s limits and conditions, we find that its Warranty Supplemental Cost Recovery surcharge cannot, in contrast to the charges in *Acadia* and *Liberty*, stand.

¶ 35    Finally, in addition to its statutory interpretation and retroactivity contentions, we note, for the record, that Nissan proceeds down one last avenue on appeal in support of its warranty surcharge. Nissan raises constitutional claims, including that the Act, as applied by the Board, violates the contracts clauses of our federal and state constitutions, and that it violates the dormant commerce clause of our federal constitution. For the final time herein, we must thoroughly disagree.

¶ 36    As we noted earlier, we, as a reviewing court, are to presume that all statutes are constitutional. See *Pooh Bah Enterprises*, 224 Ill. 2d at 406; accord *General Motors*, 224 Ill. 2d at 24. As long as it is reasonable and possible, we are to construe a statute so as to affirm its validity and as to not offend the constitution. See *Maddux*, 233 Ill. 2d at 528; *General Motors*, 224 Ill. 2d at 24. The difficult burden of rebutting this presumption lies with the party challenging the statute to clearly demonstrate its constitutional invalidity. See *General Motors*, 224 Ill. 2d at 24.

¶ 37    With respect to the contracts clauses of the United States and Illinois Constitutions, a statute violates these when it operates as a substantial impairment of a contractual relationship. See *General Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992); see also U.S. Const., art. I, § 10 ("[n]o State shall *** pass any *** Law impairing the Obligation of Contracts"); Ill. Const. 1970, art. I, § 16 ("[n]o *** law impairing the obligation of contracts *** shall be passed"). Whether there is a contractual relationship, whether the law at issue impairs that relationship, whether the impairment is substantial, and whether the law serves an important public purpose are all examined in determining whether the contracts clauses have been violated. See *Romein*, 503 U.S. at 186; *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 398 Ill. App. 3d 510, 529 (2009).

¶ 38    Nissan argues that section 6 of the Act violates the contracts clauses because it acts as a "cost recovery bar," thereby prohibiting it from exercising its contractual rights under its Dealer Agreement regarding wholesale pricing in order to recover its higher costs of having to comply with the statute. However, we have already discussed this argument's lack of merit

---

[5]Significantly, after the *Acadia* court upheld the manufacturer's warranty parity surcharge, Maine's legislature amended the state warranty reimbursement statute to expressly prohibit a manufacturer doing business in that state from recovering its costs for reimbursing its dealers for parts and labor expended during warranty repairs. See Me. Rev. Stat. tit. 10, § 1176 (2003). Clearly, the Maine legislature has now expressed the same intention Illinois's legislature had in enacting section 6(g).

earlier. First, once again, Nissan does not have a contractual right to cost recovery under its Dealer Agreement. While it does have the right to set the wholesale prices of the vehicles it sells to its Illinois dealers, Nissan never contracted for the right to recover costs associated with reimbursing them for parts and labor expended in warranty repairs. Thus, there is no contractual relationship at issue here. Second, even if there were, section 6, as we also discussed earlier, does not "bar" Nissan from recovering its costs for the warranty reimbursements it must pay its dealers under subsection (b). Rather, the Act simply limits cost recovery by requiring Nissan to follow the mechanism specifically set out for cost recovery as outlined in subsection (g). Thus, there is no impairment of any contractual relationship here, either. Moreover, even if there were a contractual relationship that was being impaired, Nissan cannot show that the impairment is substantial or that the statute does not serve an important public purpose. Our courts have already concluded that in heavily state-regulated industries like the automotive business, that parties to a contract "should be subject to further such regulation should not upset their expectations." *Commonwealth Edison*, 398 Ill. App. 3d at 530 ("where a contract contemplates the possibility that it will be affected by government action, it cannot be impaired by such action"). And, our courts have likewise made specifically clear that the Act and its provisions are "related to the legitimate government purposes of redressing the disparity in bargaining power between automobile manufacturers and their existing dealers and of protecting the public from the negative impact of harmful franchise practices by automobile manufacturers." *General Motors*, 224 Ill. 2d at 31. Accordingly, section 6 of the Act does not violate the contracts clauses of our state or federal constitutions.

¶ 39      Similarly, Nissan's constitutional challenge pursuant to the dormant commerce clause also fails. Congress has the power "[t]o regulate Commerce *** among the several States." U.S. Const., art. I, § 8, cl. 3. In conjunction with this, the dormant commerce clause prevents state and local governments from impeding the free flow of commerce between the states. See *Irwin Industrial Tool Co. v. Department of Revenue*, 238 Ill. 2d 332, 341 (2010) (it prohibits unduly restrictive or discriminatory local taxation of interstate commerce which would otherwise benefit in-state economic interests while burdening out-of-state competitors). A statute is valid under the commerce clause, and does not violate the dormant commerce clause, when it "evenhandedly effectuates a legitimate local public interest, the effect on interstate commerce is only incidental, and the burden on commerce is not clearly excessive to the local benefits." *General Motors*, 224 Ill. 2d at 27.

¶ 40      Like its prior argument under the contracts clauses, Nissan asserts that the Act violates the dormant commerce clause because, via its cost recovery bar in favor of in-state Illinois dealers, it discriminates against out-of-state manufacturers, dealers and consumers by requiring them to bear higher costs Nissan is forced to assess as recoupment for doing business in Illinois. However, once again, Nissan's argument is premised on faulty interpretation. We cannot make any more clear that the Act does not bar a manufacturer's ability to recover its costs for the warranty reimbursement mandate of section 6. The language of the Act itself does not say this, and the Board's interpretation of that language does not promote this. Rather, cost recovery is merely limited to the conditions prescribed in section 6(g), conditions which Nissan has chosen not to follow to recover its costs. Nissan cannot forego the opportunity the Act gives it to recover its costs, chose instead to impose its own method, and then complain that the Act's prohibition of its method violates the commerce clause because Nissan now has to burden its

out-of-state dealers to make up the "losses" it is experiencing in Illinois. Nissan made its choice here, and that choice clearly contravenes the plain language of Illinois law.

¶ 41 In addition, the Illinois Supreme Court has already spoken on the issue of whether the Act violates the commerce clause and has conclusively determined that it does not. See *General Motors*, 224 Ill. 2d at 28-30. Specifically, our state supreme court, following the rubric outlined above, held that the Act serves the legitimate local public interest of protecting local small-business automobile dealers and consumers from harmful franchise practices, that "there has been no showing of any decrease in interstate commerce" under the Act, and that any burden the Act has placed on interstate commerce is not clearly excessive in relation to the local benefits it provides. *General Motors*, 224 Ill. 2d at 28-30 (finding that the Act does not violate the federal commerce clause). Based on this legal precedent and our foregoing analysis, we find no reason to make the opposite conclusion in response to Nissan's constitutional challenge here.

¶ 42 In sum, this cause boils down to an improper, albeit clever, attempt by Nissan to circumvent the provisions of section 6 of the Act. Nissan must reimburse its dealers for labor and parts they expend to cover the warranties Nissan offers its consumers. See 815 ILCS 710/6(b) (West 2012). Nissan can recover this cost, but it must do so pursuant to the conditions mandated in the Act. See 815 ILCS 710/6(g) (West 2012). Nissan ignored the rules and, while following the Act by reimbursing its dealers for their warranty costs, violated it by imposing its own method of cost recovery with a charge on the dealers to, admittedly, recoup these very costs. Ultimately, what Nissan giveth with one hand, in accordance with the statute, it attempted to taketh away with the other, in violation of it. Pursuant to the plain language and ordinary meaning of section 6, its surcharge cannot stand.

¶ 43                                                    CONCLUSION

¶ 44 Accordingly, for all the foregoing reasons, we affirm the Board's decision, as well as that of the trial court, and strike down Nissan's Warranty Supplemental Cost Recovery surcharge as violative of section 6 of the Act.

¶ 45 Affirmed.